# Exhibit 1

FILED

MAR 1 2 1999

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CRATON LIDDELL, et al.,           )
                                  )
            Plaintiffs,           )
                                  )
    vs.                           )    No. 4:72CV100 SNL
                                  )
THE BOARD OF EDUCATION OF THE     )    L(266)99
CITY OF ST. LOUIS, MISSOURI,      )
et al.,                           )
                                  )
            Defendants.           )

## MEMORANDUM AND ORDER

This matter is before the Court, following a fairness hearing, to determine whether a proposed settlement agreement is fair, reasonable and adequate for the resolution of this class action school desegregation case. The settlement agreement is offered by all the parties, including the Liddell plaintiff class, the Caldwell/NAACP plaintiff class, the Board of Education of the City of St. Louis (City Board), all twenty-four school districts in St. Louis County[1], the State of Missouri and its Governor, and the United States.

This suit was filed in District Court in 1972 by a group of black parents on behalf of their children seeking school

---

[1]Affton, Bayless, Brentwood, Clayton, Ferguson-Florissant, Hancock, Hazelwood, Jennings, Kirkwood, Ladue, Lindbergh, Maplewood-Richmond Heights, Mehlville, Normandy, Parkway, Pattonville, Ritenour, Riverview Gardens, Rockwood, Special School District (SSD), University City, Valley Park, Webster Groves, and Wellston.

1

266

desegregation within the St. Louis public schools. The action resulted in a settlement plan approved by the District Court in 1983. Liddell v. Board of Educ., 567 F.Supp. 1037 (E.D. Mo. 1983, aff'd, Liddell v. Missouri, 731 F.2d 1294 (8th Cir. 1984). The plan, which has been governing the case since then, provides for quality education programs in city schools, capital improvements of city schools, magnet schools in the city, a voluntary interdistrict transfer plan, and a vocational education plan. This remedy has been funded by the State and the City Board of Education, and has been supervised by this Court on an ongoing basis with the assistance of various Court-appointed advisors and monitors.

In February 1996, the Court[2] held a hearing on the State's motion for a declaration that City Board no longer operated a segregated, or dual, public school system, but rather that "unitary status" had been achieved and that the State's funding obligations were thus over. Following the hearing, the Court appointed Dr. William Danforth as Settlement Coordinator in the hope that the parties could reach a negotiated resolution to the case.

In May 1998, the Missouri General Assembly passed Senate Bill 781 (SB 781), which provides, inter alia, for approximately $40m per year in state funds for St. Louis city schools on the condition that (1) on or before March 15, 1999, the state attorney general notify the revisor of statutes that a "final judgment" had been entered in this case as to the State and its officials, and (2) the voters of the City of St. Louis pass a sales or property tax which

---

[2]The late United States District Judge George F. Gunn, Jr.

2

would generate approximately $20m per year for the public schools.

Passage of this law gave great impetus to the settlement process.   On January 28, 1999, the Settlement Coordinator filed a statement with the Court that the parties to this action had reached an agreement for settlement of the case.   The Coordinator filed a copy of the agreement, noting that the vocational education aspect was still under discussion and that certain funding numbers awaited final calculation. The fact that an agreement had been reached was publicized in the local media, and on February 2, 1999, the voters of the City of St. Louis approved a sales tax for the city schools, as called for in SB 781.

On February 23, 1999, the proposed settlement agreement now before the Court was filed. The basic provisions of the agreement (which is identical to the earlier version with the exception of the noted items) are as follows:

City Board is obligated to provide continuing remedial educational programs "to ensure that the enjoyment of full equality of opportunity by plaintiff school children is not impaired by the effects of past segregation."   These obligations include maintaining current court-ordered all-day kindergarten, summer school, college prep and preschool programs; and maintaining the magnet school program, with some modifications, for at least ten years.   City Board also agrees to comply with State standards in many areas such as class size, libraries and counselors, and to establish standards for improvement of student outcomes.   There are provisions for school improvement and accountability, giving

3

children in a failing school the right to transfer to a successful school.

The State agrees to pay City Board a total of $180m for construction of new schools to accommodate any increase in enrolment due to any decrease in the number of transfer students. It is understood by the parties that City Board will receive a minimum of $60m a year from State aid under Senate Bill 781 and the new sales tax.

An area-wide vocational education program will be governed by a seven-member board of directors with city and county representation. Special School District (SSD) shall operate the vocational schools in the county, and City Board shall assume operation of the Career Academy in the city. The State and SSD are each to pay City Board approximately $10m for the construction of a new comprehensive vocational education high school in the city. The Transitional School District created by SB 781 will be dissolved by the State Board of Education, with revenues from the new sales tax assigned to City Board. The plaintiffs may compel specific performance of the terms of the agreement by the State or City Board in federal court.

All county districts, with the exception of Ladue, agree to accept new city transfer students for at least three years. To economize on transportation costs, attendance zones are to be established for the transfer students. In the event of any phase-out of the transfer program, all city students then enrolled in county schools will have the right to complete high school in the

4

county. A "New Entity" is to be established to operate the transfer program, and adequate State funding will be available for the continuing voluntary transfer plan.

Under Federal Rule of Civil Procedure 23(e), a class action may not be settled without approval of the Court, and notice of the proposed settlement must be given to all class members. Accordingly, the Court scheduled a "fairness hearing" for March 9, 1999. Notice of the proposed settlement and of the hearing was published in the St. Louis Post Dispatch on Sunday, February 21, 1999,[3] Thursday, February 25, 1999, and Wednesday, March 3, 1999; and in the weekly St. Louis American and St. Louis Sentinel (published by the NAACP) on Thursday, February 25, 1999. The notice was also posted in the lobby of the federal courthouse in downtown St. Louis, and distributed to parents' groups throughout the area. The notice was addressed to all students, and their parents, now attending or who will attend a public school in St. Louis city or county. It stated that a settlement had been reached and noted the date, time and place of the fairness hearing. The notice encouraged all class members to examine the settlement agreement carefully, noting that copies of the agreement were available for inspection at the federal courthouse, the principal's office of each public school in the city, the administrative office of each of the county school districts, the offices of the NAACP and of the Voluntary Interdistrict Coordinating Counsel (VICC), and

---

[3] This notice was published before the filing of the final version of the Agreement.

on the Internet at the St. Louis Post Dispatch website.  The notice
stated that class members could file a written statement with the
Court supporting or objecting to the agreement and that anyone who
filed a statement on or before Friday, March 6, 1999, would have
the opportunity to speak at the hearing.  Sixty-seven written
statements were timely filed.

At the hearing, the Attorney General accepted blame on behalf
of the State for past segregation in its public schools and
apologized for this inequity.  He noted that the continued funding
provided for by the state legislature in SB 718 was evidence that
this was not an empty apology.  Counsel for the other proponents of
the settlement urged the Court to approve the settlement agreement.
The overwhelming consensus was that while the settlement did not
provide a perfect remedy, it is fair, reasonable and adequate
because it guarantees long-term funding for continuing the key
aspects of the 1983 plan, including remedial programs in the city
schools, the magnet schools, the voluntary transfer program, and an
area-wide vocational education plan.  When this relief is weighed
against the risk that the case may be adversely decided against the
plaintiffs sometime within the next few years, with funding
terminating relatively quickly, the balance, in counsels' opinion,
clearly favors the settlement.

The Liddell plaintiffs called Ms. Minnie Liddell, a named
class representative, as a witness.  She testified that she has
remained closely involved with the case since its inception, and

6

believes the agreement, while not perfect, should be approved. She testified that if City Board lived up to its obligations under the agreement, the most important goal of the case - providing a quality education to black city children - would be achieved. She expressed concern that the agreement does not provide for a funded monitoring group.

Dr. James DeClue, who served as president of the local NAACP and was the chairman of its educational committee for over 20 years, testified that the NAACP had excellent representation in this case throughout the years. He has monitored school desegregation cases throughout the country and believes that, given the complexity of this case, the settlement agreement is an amazing accomplishment. He further testified that the agreement enjoys wide community support.

The Superintendent of Parkway School District testified that his district has a good-faith commitment to continue striving for the success of the voluntary transfer program. He felt that this good-faith commitment was shared by the other districts who will be participating in the program. He also testified that much of the ground work for establishing the "New Entity" has been completed and that there would be a smooth transition in operations should the settlement be approved.

The Superintendent of the City School District testified that he believes the agreement provides an excellent opportunity for assuring a quality education for all city students. Although the agreement does not address all the issues City Board deemed

necessary to fully achieve desegregation, the Board supports approval of the agreement. City Board has hired a new `accountability officer' to assist in efforts to improve student achievements. The Superintendent stated that City Board would cooperate with a community monitoring group, and that it was his intention to carry out every feature of the agreement. He stated the Board is committed to an effective preventive maintenance plan for city school buildings.

Counsel for the St. Louis Teachers Union Local 420 and for the City of St. Louis spoke in opposition to the agreement. The Union objected on the ground that the funding and educational programs under the agreement fall short of the current court-ordered remedy. The City objected on that ground that the agreement calls for the dissolution of the Transitional School District.

Eleven individuals who had filed written objections addressed the Court. The main objection raised in these presentations, as well as in the written objections filed by those who did not speak at the hearing, was that the agreement provides inadequate funds for the city schools. Other objections were that under the agreement, magnet schools are unfairly funded at a higher level than the regular city schools, there is no provision for a funded monitoring entity with some authority, many questions regarding the future of the magnet schools and the operation of the "New Entity" are unanswered, the vocational education provisions do not adequately insure the continuation of the program at the Career Academy, the new attendance zones for transfer students are not

8

defined, and the construction of a new Vashon High School is not mandated. There were objections on the ground that the voluntary transfer plan is a failure and should be discontinued. Residents of Maplewood-Richmond Heights objected on the ground that students from their district in city magnet schools are not guaranteed the right to continue in the magnet program. One city resident spoke in favor of the agreement because it allowed City Board to eliminate the priority given to white county students over white city students for seats in the magnet schools.

A District Court may only approve a class action settlement that is "fair, reasonable, and adequate." Grunin v. International House of Pancakes, 513 F.2d 114,123 (8th Cir.), cert. denied, 423 U.S. 864 (1975). The Court must also insure that the terms of the agreement meet constitutional standards. Liddell v. Caldwell, 546 F.2d 768, 773-74 (8th Cir. 1976), cert. denied, 433 U.S. 914 (1977).

As stated by the Eight Circuit Court of Appeals in the context of another class action school desegregation case,

> [t]he law strongly favors settlement. Courts should hospitably receive them. This may be especially true in the present context - a protracted, highly divisive, even bitter litigation, any lasting solution to which necessarily depends on the good faith and cooperation of all the parties. . . . As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming.

Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., 921 F.2d 1371, 1383 (8th Cir. 1990).

This does not mean that a court must automatically approve

9

anything that the parties set before it.  Rather, to protect the interests of absent class members, as well as those of the public as a whole, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is fair, reasonable and adequate.  Grunin, 513 F.3d at 123; Armstrong v. Board of Sch. Dirs., 616 F.2d 305, 312-13 (7th Cir. 1980).

In making its assessment, the Court considers such factors as (1) the strength of the case for plaintiffs on the merits, balanced against the relief offered in the settlement;

(2) the complexity, length and expense of further litigation;

(3) the amount of opposition to the settlement;

(4) whether the settlement has been arrived at by arms-length bargaining; and

(5) whether the proponents of the settlement are represented by counsel experienced in similar litigation.  Grunin, 513 F.2d at 124; 2 Herbert B. Newberg, Newberg on Class Actions §11.41 (3d ed. 1992).

The Court first concludes that the notice given in this case satisfies Federal Rule of Civil Procedure 23 and due process in that it was reasonably calculated, under all the circumstances, to apprise interested parties of the fairness hearing, and to afford them the opportunity to present their objections.  See Grunin, 513 F.2d at 120-21.  The notice clearly conveyed the required information, was widespread throughout the metropolitan area in various media, and afforded those interested a reasonable amount of

time to review the Settlement Agreement and formulate a meaningful objection. There have been no objections to the content, timeliness or scope of the notice provided.

The Court next concludes that the Settlement Agreement represents a fair, reasonable and adequate resolution to this historic case. In reaching this conclusion, the Court gives great credence to the testimony of Minnie Liddell and Dr. James DeClue. These two individuals have served as tireless and vigorous representatives of the plaintiff classes, and have fought hard for the rights and interests of the black students in the city. They have been actively involved in the case from the beginning, and have deep roots in the community and great sensitivity to community concerns. The fact that they, and the board of the NAACP, endorse the settlement is entitled to great weight.

The educational initiatives for students in city schools forms the basis of the settlement agreement. These initiatives are substantial, calling upon City Board to implement research-based programs and focus on improving student achievement. The Court credits the testimony of the city superintendent regarding City Board's good-faith commitment to see that these aspects of the agreement are successfully implemented. The Court also credits the testimony of the county superintendent that the county districts will work towards the continued success of the voluntary transfer program.

The Court concludes that the settlement is adequately funded so as to ensure that City Board's obligations under the agreement

11

can be fulfilled. Funding is grounded in SB 781, which provides that funding will be derived from the local sales tax approved by the voters and the amendments in SB 781 to the State's statutory scheme of school funding. The sales tax was properly authorized by the General Assembly[4] and properly placed on the ballot. No procedural challenges to the election have been timely filed.[5] The State agrees to provide the funds as set forth in SB 781 and all the signatories have agreed to the financial terms. Furthermore, the revenues generated by the sales tax shall be paid directly to, or assigned by the Transitional District to City Board.

In sum, the relief offered under the settlement is substantial and adequate to assure the opportunity for a quality education for children of the plaintiff classes. This factor weighs heavily in favor of approval of the agreement.

The agreement in this case was reached following a unitary status hearing. Thus the parties had a full opportunity to assess the risk of continued litigation and to weigh the relief offered by the settlement against that risk. The plaintiffs also recognized the risk that even if they were to prevail on the current motion for unitary status should litigation continue, the State could renew its motion in the near future. If the State were successful on a subsequent motion, the remedy in this case might be phased out over a relatively short period of time. In contrast, under the

_____

[4]See Mo. Const. Art. X, §11(f).

[5]Mo. Rev. Stat. §115.577 provides for a thirty-day period in which an election may be challenged.

12

proposed settlement agreement, the major elements of the desegregation remedy will receive funding for at least ten years, and probably longer.

The complexity, length and expense of further litigation are all factors which weigh in favor of approval of the proposed settlement.

The amount and type of opposition expressed against the agreement is not weighty in light of the scope and notoriety of this lawsuit. See Van Horn v. Trickey, 840 F.2d 604, 606 (8th Cir. 1988) (settlement may be approved even over significant percentage of objections from class members). The Court notes that approximately one-third of the written objections are from white county parents whose own school district has the right to decide whether or not their children may continue attending the magnet schools. The Court also notes the strong support for the agreement expressed by the voters of the City of St. Louis in passing the new sales tax by an overwhelming majority.

There can be no doubt that the agreement before the Court is the product of arms-length negotiation among competent counsel struggling to protect their clients' interests. This is evident from the size and scope of the agreement and in the compromises reflected therein. The lack of any collusion is further apparent from the facts that the negotiations were protracted and supervised by a court-appointed coordinator.

Nor can there be any doubt that plaintiffs in this case received expert legal representation by experienced and committed

13

attorneys.   The Court, mindful of its responsibility to act as guardian for those absent parties who are to be affected by this litigation, gives great weight to the fact that the attorneys for all the plaintiffs and defendants who have been engaged in this arduous litigation for many years unanimously support the settlement.   The support of the United States Department of Justice is further assurance that the interests of all those affected by this case have been considered.

All of these factors weigh in favor of approving the settlement agreement.

In these days when there is popular concern about the effectiveness of our democratic institutions, it is refreshing for this Court, representing our judicial branch of government, to be a part of a successful settlement process involving a school desegregation case which has the support of the other two branches of government, as well as of the people.

The United States of America, the State of Missouri, its Governor and Attorney General, numerous state administrative heads, twenty-five school districts, the NAACP and a variety of local entities have proffered a settlement.   The Missouri Attorney General has apologized in open court for past state constitutional transgressions.   The legislative branch of the State of Missouri has enacted a law that will provide long-term funding of on-going programs to implement school desegregation.   The voters of the City of St. Louis have approved by almost a two to one margin a sales tax increase to supplement the funding provided by the Missouri

- 14 -

legislature. It is now time for the last player in our democratic process, the judiciary, to be involved in the settlement proceedings. This Court approves the proposed settlement.

Rarely, if ever, in school desegregation cases and infrequently in class-action suits in general, have government entities and the public shown such amazing support for a settlement. To rebuff this proffer of settlement would be tantamount to an exercise of gross judicial activism, but most importantly, as set out in this opinion, the settlement should be approved because it meets the legal standard of being fair, reasonable and adequate.

Even so, the settlement agreement is not a panacea to achieve maximum school desegregation or extraordinary student education. Every school system in our nation has shortcomings, and what one parent, student or teacher extols as a remedy is looked on with disfavor by others. Thus, while one or more provisions in the agreement may be considered inappropriate by some, the overall content addresses successfully the concerns raised in this case. Accordingly, this Court urges the parties to implement with rapidity and fairness their obligations under the agreement with special emphasis on:

a. Developing and implementing professional staff accountability, paragraph 7L, page 10 of the agreement;

b. Developing and implementing teacher training and recruitment, paragraph 8, page 11 of the agreement;

c. Implementing with all speed the "New Entity,"

paragraph 13, page 19, 20 of the agreement;

     d.   Establishing   the   "Vocational   Education Cooperative" and the "Cooperative Parent Advisory Council," paragraph A, page 27 and B, 10 page 27 of the agreement;

     e.   Giving special and immediate attention to establishing, implementing and financing "a community monitoring and support task force," paragraph 19, page 35 of the agreement;

     f.   Implementing a post-judgment agreement that will continue the objectives of the Investigative Learning Centers Commission, and;

     g.   Implementing an immediate and long-range program to keep the city schools in a good state of repair.

The successes that have been achieved in this twenty-seven year old case are the result of substantial input of many. Dr. Susan Uchitelle, Executive Director of VICC, and her staff have performed efficient service in operating the student transfer program.

Dr. Ralph Beacham, Executive Director of the Vocational Education Oversight Office (VEOO), has rendered substantial help in the operation of the vocational education program.

Dr. James D. Dixon, II, Executive Director of the Education Monitoring and Advisory Committee (EMAC), and his staff have been dedicated overseers of the educational program in the city schools,

providing the Court with valuable information.

Dr. Warren M. Brown, Chair of the Budget Review Committee (BRC), and his assistant, Dr. Jay L. Moody, have achieved great financial stability for all entities involved in overseeing the budgets and money expenditures in this complex case.

Attorney Shulamith Simon has served as Amicus and legal advisor to three judges overseeing this case. Her wise counsel and advice have been critical to the success of the program. Special Amicus Lawrence K. Roos has given dedicated service on the vocational education aspect of the case.

Without the professional contribution of all these persons and their staffs, this case would never have progressed to today's level. Their support cannot be overemphasized.

The passage of SB 781 was an extraordinary feat. Many legislators voted in favor of the bill when numerous constituents were opposed. Without the financing provided by the bill, a settlement would not have been possible. The Missouri legislative branch of government has thus played a vital role in the settlement process. It represents government in its best form.

The work of the Settlement Coordinator, Dr. William Danforth, was monumental. His virtues of patience, perseverance, hard work and common sense provided the framework for successful mediation. No one can imagine the endless hours of effort spent in bargaining sessions with lawyers and clients, many of which extended past midnight. He was a giant in the process.

The Court recognizes proudly the lawyers and their clients -

at times as many as fifty attorneys were involved. On frequent occasions, school superintendents and board members were present for negotiating sessions. Without their give and take, nothing would have been accomplished. They made the final decisions resulting in the settlement agreement.

Three law clerks have assisted the last three judges who have been assigned to this case. These superb lawyers, Phyllis Shapiro, Tracey Litz and Bonnie Day, have had a devotion to duty far beyond what is expected of their office. Their challenging suggestions, warm manner, keen analysis and quick grasp of problems and tender of solutions have assisted the judges for whom they worked in extraordinary fashion.

The final person who must receive special mention and afforded great credit for the successful resolution of the issues in this case is the late Judge George F. Gunn, Jr. It was he who had the vision. He appointed Dr. Danforth as settlement coordinator and lent the prestige of his splendid character to the support of a settlement. He was truly a most vital player.

Of the thousands of public school systems in our land, only a few are subject to court control. In those instances, the challenge has been to alleviate constitutional transgressions and to eliminate segregation. The courts are equipped to say what the law is, and to order that it be obeyed; they are ill-equipped to implement, especially in fields such as education where judges have no expertise.

In this case, the Court has stated what the law is and that it

- 18 -

must be followed. There shall be no school segregation. The business of running the schools and the educational process is now returned to the professional administrators, teachers and staff. It is their expertise on which we must rely in carrying out a successful educational program for all. They must stand on their own feet. Yet, the community can help. Support and constructive criticism is the obligation of all citizens and making quality education available for all is everybody's business. It must be done, though, without rancor and only in a spirit of good will in an attempt to achieve the best educational results possible.

The Court's order in this case is entered upon a settlement agreement; this order is thus a "final judgment" for purposes of SB 781.

Accordingly,

**IT IS HEREBY ORDERED** that the settlement agreement is approved as fair, reasonable, adequate and constitutionally permissible. The agreement is an appropriate remedy for resolving this race-based litigation, and is incorporated herein.

**IT IS FURTHER ORDERED** that this case is dismissed with prejudice as to all parties and all claims, in accordance with this memorandum and order. All prior injunctions issued in this case are dissolved.

**IT IS FURTHER ORDERED** that City Board and the Director of Revenue of the State of Missouri shall follow the procedures and instructions set forth in other statutes which govern local sales

taxes[6] in collecting the proceeds of the new sales tax effective July, 1, 1999. These funds shall be forwarded to the Treasurer of the Board of Education of the City of St. Louis, no later than the tenth of each month, and City Board shall assume the responsibilities of the taxing entity as described in Mo. Rev. Stat. §32.087.1.

**IT IS FURTHER ORDERED** that the revenues from any tax imposed through a ballot measure by the Transitional School District, and any resulting State and federal aid (excluding any attributable to transfer students), shall be unconditionally assigned to City Board if received by the Transitional School District.

**IT IS FURTHER ORDERED** that all other pending motions in this case are denied as moot.

**IT IS FURTHER ORDERED** that on or before March 15, 1999, the Attorney General of the State of Missouri shall provide notice to the revisor of statutes that final judgment has been entered in this case as to the State of Missouri and its officials.

Dated this _____ 12ᵗʰ _____ day of March, 1999.


UNITED STATES DISTRICT JUDGE

---

[6]Rev. Mo. Stat. §§32.087 & 94.550.

UNITED STATES DISTRICT COURT – EASTERN MISSOURI
INTERNAL RECORD KEEPING


AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED AND FAXED TO THE FOLLOWING
INDIVIDUALS ON 03/12/99 by bcrow
                    4:72cv100    Liddell vs Board of Education

28:1343 Violation of Civil Rights

Robert Baine  -  18673              Fax: 314-838-7727
Eric Banks  -  35961                Fax: 314-622-4956

Robert Bartman -
P.O. Box 480
Jefferson City, MO  65102                               SCANNED & FAXED BY:

                                                        MAR 1 2 1999
Ralph Beacham -                     Fax: 314-535-1416
Mark Bremer  -  2703                Fax: 314-241-2509         K. M. E.
John Brink -                        Fax: 314-340-7891
Kenneth Brostron  -  2715           Fax: 314-621-6844
Warren Brown -                      Fax: 314-561-3008
George Bude  -  9859                Fax: 314-727-2824
Worsham Caldwell -                  Fax: 314-421-5377
Douglas Copeland  -  2872           Fax: 314-726-2361
Darold Crotzer  -  2902             Fax: 314-726-5120
James Dixon -                       Fax: 314-231-3811
William Douthit -                   Fax: 314-434-7759
Michael Fields -                    Fax: 573-751-9456
Charles Ford  -  3123               Fax: 314-726-5120
John Gianoulakis  -  3207           Fax: 314-241-2509
Jeremiah Glassman -                 Fax: 202-514-8337
Richard Hughes  -  10502            Fax: 314-421-5377
Veronica Johnson  -  57348          Fax: 314-454-1911
Mark Keaney  -  3530                Fax: 314-241-6056
Andrew Leonard  -  3669             Fax: 314-532-0857
John Lynch  -  3720                 Fax: 314-340-7029
Robert McClintock  -  20975         Fax: 314-394-0886
Henry Menghini  -  3843             Fax: 314-421-0239

Michael Middleton -
1901 Fairview Road
Columbia, MO  65203

Andrew Minardi  -  3866             Fax: 314-940-4666
John Munich -                       Fax: 404-853-8806
Charles Oldham  -  3998             Fax: 314-241-6608
Sandra Padgett  -  17813            Fax: 314-726-5120

Gregory Scott -
Assistant Attorney General
ATTORNEY GENERAL OF MISSOURI
221 W. High Street
P.O. Box 899
Jefferson City, MO  65102 - 0899

Anthony Sestric  -  4332            Fax: 314-241-8603
Shulamith Simon  -  4375            Fax: 314-727-9071
Donna Smith  -  66563               Fax: 314-432-2560
Frank Susman  -  4504               Fax: 314-725-7288
William Taylor -                    Fax: 202-223-5302
Thomas Tueth  -  4575               Fax: 314-345-6060
Susan Uchitelle -                   Fax: 314-721-8371
Richard Ulrich  -  4585             Fax: 314-991-2413

E

SCANNED & FAXED BY:

MAR 1 2 1999

K. M. E.