# Exhibit 2



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

FILED

FEB 23 1999

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

CRATON LIDDELL, et al.,

    Plaintiffs,

    vs.

THE BOARD OF EDUCATION OF THE CITY
OF ST. LOUIS, MISSOURI, et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)

No. 4:72CV100 SNL

L( 167 )99
*Leave to file granted*
*Stephen N. Limbaugh*
*2/23/99*

### MEMORANDUM

On behalf of the Settlement Coordinator, Dr. William H. Danforth, and the

Signatories, the Board of Education of the City of St. Louis submits the attached

Settlement Agreement for this Court's consideration and approval.

                Respectfully submitted,

                LASHLY AND BAER,
                A Professional Corporation

                By
                Kenneth C. Brostron  #02715
                Dirk DeYong        #22592
                714 Locust Street
                St. Louis, Missouri  63101
                (314) 621-2939
                FAX:  (314) 621-6844

                Attorneys for The Board of Education of
                the City of St. Louis

L( 167 )99

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was mailed this 23rd day of
Feb        , 1999, by prepaid United States mail to All Counsel of Record.

2

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by the parties to replace the provisions of all court orders in *Craton Liddell, et al., v. The Board of Education of the City of St. Louis, et al.*, Case No. 4:72-CV100-SNL insofar as those orders define the obligations of the State of Missouri. This Agreement is also entered into by the parties to replace the substantive and financial obligations placed upon the City Board by all previous orders in the Liddell litigation.

The signatories to this Agreement are the certified classes of plaintiffs as represented by the Caldwell-NAACP and Liddell plaintiffs who have conducted this litigation ("Plaintiffs"); the United States, a plaintiff-intervenor ("United States"); the Board of Education of the City of St. Louis, its members and the Superintendent of Schools ("City Board"); the State of Missouri and its Governor, Attorney General, Treasurer, Commissioner of Administration, Commissioner of Education and the Missouri State Board of Education and its members ("State Defendants"), and the following County School Districts: Affton, Bayless, Brentwood, Clayton, Ferguson-Florissant, Hancock, Hazelwood, Jennings, Kirkwood, Ladue, Lindbergh, Maplewood-Richmond Heights, Mehlville, Normandy, Parkway, Pattonville, Ritenour, Riverview Gardens, Rockwood, Special School District, University City, Valley Park, Webster Groves, and Wellston. In this Agreement, the term "parties" does not include the County Districts.

The parties recognize that the substantive remedial obligations of the City Board are set forth in various court orders. These include, but are not limited to: the District Court's Order of July 5, 1983, *Liddell v. Board of Education*, 567 F. Supp. 1037 (E.D.



Mo. 1983) (providing *inter alia*, for magnet schools, part-time educational programs, quality education initiatives, and other *Milliken II* programs in the public schools of the City of St. Louis); the District Court's Order of May 21, 1980, *Liddell v. Board of Education*, 491 F.Supp. 351 (E.D. Mo. 1980) (providing for a comprehensive desegregation plan including, *inter alia*, student assignment, transportation, faculty and staff assignment, certain magnet schools, and educational improvements); and various other subsequent remedial orders directed to the City Board.

The Plaintiffs, the United States and the City Board recognize the need for continuing remedial efforts to ensure that the enjoyment of full equality of opportunity by plaintiff school children is not impaired by the effects of past segregation.

This Agreement is intended to provide a complete substitute for and modification of all substantive remedial obligations placed upon the City Board by the above-referenced orders, subject to financing pursuant to Missouri Senate Bill 781.

This Agreement is intended to serve as a final judgment as to the State Defendants and the City Board in the Liddell litigation and to terminate the continuing jurisdiction and supervision of the Court over the State Defendants and City Board subject only to Section 22 of this Agreement.

The parties have entered into this Agreement to dispense with the likelihood of further complex, lengthy and expensive litigation and to provide an appropriate education for St. Louis children.

The Parties agree as follows:

2

1.    <u>CONTINUATION OF *MILLIKEN II* PROGRAMS</u> – The City Board will continue for a period of at least ten years from the effective date of this Agreement, at funding levels sufficient to maintain current levels of enrollment, scope and quality, the following programs:

     a.    All-day kindergarten;

     b.    Summer school;

     c.    College-prep or a similar program designed to improve college attendance.

     d.    The City Board will maintain the current scope and quality of its preschool program.  In addition, by 2003-04, the City Board will increase by 500 the number of preschool seats available above the number available during the 1998-99 school year, subject to the availability of funds pursuant to House Bill 1519 as passed by the Missouri Legislature on May 5, 1998.  Preschool programs will meet all licensing and accreditation standards.  Priority for additional seats will be given to 3 to 5- year old children residing in the city of St. Louis, who are from low-income families or who demonstrate educational need, and who are not yet eligible to attend kindergarten.  The parties agree that the City Board may use any combination of federal (including Title I), state or local funds that it receives that may be available for preschool programs.

Nothing in this section shall prohibit the City Board from increasing further the funding for, or availability of, the aforementioned programs.

2.    <u>CONTINUATION OF MAGNET SCHOOLS</u> – The City Board will maintain the existing magnet school program (excluding the Multimedia Electronic Graphic Arts program or "MEGA"), for at least ten years from the effective date of this Agreement, and will continue to pursue the goal of enrolling at least 14,000 students in magnet schools. The parties further agree:

a.    <u>Funding.</u>  The City Board will provide funding, at minimum, at levels sufficient to maintain current levels of enrollment, scope and quality.  If the City Board desires to substantially reduce the number of seats available or the amount of funding, or to disestablish an existing court-ordered magnet program, the agreement of the Caldwell/NAACP Plaintiffs, the Liddell Plaintiffs, and the United States, but not the other parties, shall be necessary.

b.    <u>Enrollment.</u>  The City Board may in its sole discretion establish and modify individual magnet school target enrollments, modify grade configurations, modify or eliminate admission priorities, modify pupil teacher ratios in accordance with Section 3, or increase the number of seats available, except that at least 20% of magnet seats will be at the middle school level and at least 20% of magnet seats will be at the high school level.  Beginning in the 1999-2000 school year, the racial balance goal will be changed to 60% black and 40% white, plus or minus five percentage points.

c.    <u>Limitation.</u>  The above subsections apply to all current Court-approved magnet programs.  The City Board retains the discretion,

4

however, to establish, continue and disestablish additional magnet schools, including the MEGA magnets, under such conditions and limitations that it determines appropriate, and consistent with the applicable grant or funding statute for the magnet school, if any.

3.    STATE STANDARDS – The City Board will allocate sufficient resources and take all steps necessary to comply with State standards in all schools in the areas of resources, course offerings, staffing and student performance, and to remain accredited by the State Board of Education.  The parties agree that compliance with State "minimum" standards will comply with this section.  In addition:

    a.    School Libraries and Media Centers.  The City Board will strive to meet State desirable standards at all grade levels.  Sections 3 and 3a. of the Agreement do not apply to space requirements for school libraries and media centers.

    b.    Counselors.  The City Board will strive to meet State desirable standards at all grade levels.

    c.    Course Offerings.  The City Board will exceed State minimum standards and strive to meet State desirable standards with respect to high school course offerings in English/Language Arts, Foreign Languages, Social Studies, Mathematics, and Science.

    d.    Class Sizes.  The City Board will meet by the beginning of the 2001-02 school year State desirable standards in grades K-4.  The parties



further agree that the City Board may maintain smaller class sizes and that there is a particular need for smaller class sizes in schools with the highest concentrations of children from low income families.

e.    Term.  The obligations created in subsections (a) through (d) of this Section will expire ten years from the effective date of this Agreement.

4.    DISCONTINUATION OF *MILLIKEN II* PROGRAMS — The City Board will have sole discretion to modify or eliminate any current Court-ordered *Milliken II* program or expenditure not identified in Sections 1 or 2 of this Agreement, and not necessary for purposes of Section 3.

5.    JANUARY 1998 AGREEMENT. – The Settlement Agreement between plaintiffs and the City Board dated January 5, 1998 ("Interim Agreement"), attached hereto as Appendix E, is incorporated by reference,  and shall expire ten years from the effective date of this Agreement.

6.    STUDENT OUTCOMES – The City Board will establish district-wide standards for improvement of student outcomes as follows:

a.    Student Achievement

(i)    The City Board shall reduce by a minimum of three percentage points per year the proportion of students in the "step 1" and "progressing" achievement levels on the Missouri Assessment Program (MAP) in grades 3, 7 and 11 for

6

communication arts; grades 4, 8 and 10 for mathematics; and in grades 3, 7 and 10 for science (that is, for example, if the percentage of students achieving at the "step 1" level in 3rd grade communication arts is 31% for Spring, 1998, the required percentage of students achieving at the "step 1" level would be 28% for Spring, 1999). When measuring the reduction in the percentage of students achieving at the "progressing" level, the calculation will take into account any increase in the percentage of students achieving at the "progressing" level that results from a reduction in the percent-age of students achieving at the "step 1" level. This reduction shall be measured from Spring, 1998 results. The requirement for these reductions shall continue until the percentage of SLPS children in each of these two categories is equal to or less than the statewide average percentage in each of these categories.

(ii)     Increase on a continuing basis the combined percentage of students scoring at the "proficient" and "advanced achievement" levels on the MAP in grades 3, 7 and 11 for communication arts; grades 4, 8 and 10 for mathematics; and in grades 3, 7 and 10 for science. This increase shall be measured from Spring, 1998 results. The requirements for these increases shall continue until the percentage of SLPS students scoring in the "proficient" and



"advanced" levels is equal to or greater than the statewide average percentage in these levels.

(iii)     The City Board will ensure to the extent practicable that all eligible students are included in the assessments of student achievement referred to in this Agreement.

(iv)     If the State assessment system referred to in this Agreement is repealed or substantially changed, the Parties will seek to agree on what replacement measures should be adopted.

b.     Attendance.  SLPS and each school shall increase average daily attendance to at least 91.5%, as measured by the Maritz formula,  by the end of the 1999-2000 school year and 1% each year thereafter until SLPS reaches the State average attendance rate.

c.     Drop-Out Rate.  SLPS, and each high school, shall reduce the drop-out rate by 7% by the end of the 2000-2001 school year and reduce by .5% each year thereafter until the SLPS drop-out rate is within 2% of the State average drop-out rate.  The reduction shall be measured from the 1997-1998 school year.  The drop-out rate shall be calculated by State formula or by actual follow-up count by student name.

d.     Career Preparation.  SLPS, and each high school shall meet Show Me Standards in the following areas within four years from the effective date of this Agreement, and maintain for at least six years thereafter:

1.     Career Preparation;
2.     College Preparatory Study;
3.     Advanced Course Work; and
4.     College Credit.

8



7.   SCHOOL IMPROVEMENT AND ACCOUNTABILITY –

a.    Performance Standards.  The City Board shall establish and disseminate to all schools annual performance standards that it will require of each of its schools.  The standards will include the standards in Section 6 of this Agreement and may include other standards which the City Board may adopt.

b.    School Identification.  Following the process described in Section 1.A of the Interim Agreement, and using the outcome standards described in Section 6(a) of this Agreement, the City Board will identify a total of 40 schools (inclusive of those schools identified pursuant to the January 5, 1998 Interim Agreement) for intensive school improvement over a period of ten years from the effective date of this Agreement.

c.    School Improvement and Remediation.  Each school identified under subsection (b) will be subject to the intensive remediation provisions of Section 1.C of the Interim Agreement.

d.    Reconstitution.  In addition to the schools reconstituted pursuant to the Interim Agreement, the City Board will reconstitute a minimum of two additional schools per year, for an eight-year period, that fail to meet the outcome standards described in Section 7(a) of this Agreement.  The eight-year period shall begin with the 2001-02 school year.  Schools selected for reconstitution will be those deemed by the City Board to have made the least progress toward meeting the outcome standards, or least

9

likely to make sufficient progress in the very near future.  Reconstitution

remedies may include any or all of those remedies specified in Section

2.B of the Interim Agreement.

e.     Right of Transfer.  Notwithstanding any other remedy, when a

student is assigned to a school identified for improvement which fails to

meet the outcome standards after a two-year period following such

identification and which is not scheduled for reconstitution in the following

year, the City Board will, to the extent space is available, provide the

student with an opportunity to transfer to another SLPS school designated

by the City Board which is not so identified and SLPS will provide

transportation to the student as appropriate.  The State shall not utilize

transportation provided pursuant to this Section in determining the

efficiency of the City Board's transportation, and the City Board shall

receive State transportation aid.

f.     Professional Staff Accountability.  The City Board will develop and

implement for a minimum of ten years and consistent with State law a

teacher and principal accountability plan which will specify rewards and

sanctions based upon their job performance and student outcomes in their

building.

7.A.   STANDARDS -- The achievement standards specified herein, including

but not limited to the "student outcomes" in paragraph 6 and the "school

improvement and accountability" standards in paragraph 7, are standards

adopted by the parties for purposes of this Agreement and do not supercede any State standards including "Missouri School Improvement Program" standards.

8.    <u>TEACHER TRAINING AND RECRUITMENT</u> – On or before September 30, 1999 the City Board will develop, and will implement for a minimum of ten years, the teacher training and recruitment program specified in the Interim Agreement.  On or before June 30, 1999, the City Board will convene a planning meeting for the purpose of developing a joint effort to recruit and retain highly educated young people to teach in the SLPS.  Invitees to the meeting will include representatives of area colleges and universities, the plaintiffs, the St. Louis Teachers Union, and the Missouri Department of Elementary and Secondary Education.

9.    <u>DESEGREGATION</u> –  The City Board, the SSD, the Metropolitan Cooperative and all parties recognize that desegregation serves important remedial and educational goals and helps children to prepare for participation in a pluralistic society. Therefore, the City Board, the SSD, the Metropolitan Cooperative and all parties will continue to pursue a policy of desegregation, which will include decisions and actions relating to the assignment of students to schools and classrooms, the construction, consolidation, closing or renovation of school facilities and the assignment of faculty and staff to schools.

10.   <u>CAPITAL NEEDS</u> – Beginning July 1, 1999 and each July 1 thereafter the State shall pay to the City Board the following sums for construction and site acquisition costs to accommodate any reasonably anticipated net enrollment increase caused by any reduction or elimination of the voluntary transfer plan:

| | | | |
|---|---|---|---|
| July 1, 1999 | $28.5 million | July 1,2005 | $13 million |
| July 1, 2000 | $25 million | July 1, 2006 | $12 million |
| July 1, 2001 | $20 million | July 1, 2007 | $11 million |
| July 1, 2002 | $20 million | July 1, 2008 | $10 million |
| July 1, 2003 | $16.5 million | July 1, 2009 | $9 million |
| July 1, 2004 | $15 million | | |

These payments shall be made by the State each July 1 into a separate account established by the City Board.  All interest will accrue to the benefit of the City Board.  These payments shall not be considered desegregation payments.

Newly constructed schools will be built in conformity with area standards for school construction.  If unused and unobligated funds remain four years after the last student terminates participation in the interdistrict transfer program, the parties shall discuss the use of these funds, including but not limited to reversion of those funds to the State.

11.1.   <u>FUNDING</u> - The parties agree that an express condition to the City Board's decision to accept this Agreement is that the sales tax and the resulting State aid will produce a minimum of $60 million in additional funding for the St. Louis Public Schools based on current SLPS enrollments and current levels of participation in the interdistrict transfer program.  Towards this end, the signatories agree that at no time will any proration factor affecting Line 14(a) or

12



(b) be less than the highest proration factor applied to Lines 1(a) or (b) of the State Foundation Formula. The parties also agree that with a proration factor of 1.0, the Formula will generate funds as set forth in Appendix B, Columns 4, 5 and 6. For the 1999-2000 school year, no revenue amounts received because of half-count transfer students during the 1998-99 school year will be included in lines 7, 8 or 9 of the State Aid Formula.

11.2   The State contractually guarantees the City Board for current resident City students after deductions that full funding of SB 781 will in fact be provided in the future as follows: (1) the amount per pupil for 1999-2000 shall be $4,154 for a free and reduced lunch student and $2,838 for a non-free and reduced lunch student for Lines 1 and 14 of the Formula after deductions, and (2) for each year thereafter, the State contractually guarantees payment of Lines 1 and 14 of the Formula after deductions of the greater of the amount computed for 1999-2000 or the amount calculated for the then current year.

11.3   Without limiting any current (or future new) source of funding to which Participating Districts or the New Entity are entitled based on services provided, staffing or any other criteria, the State contractually guarantees the City Board and the New Entity that full funding of SB 781 on a per pupil basis shall be provided, and further specifically agrees as follows:

> (1)   For 1999-2000, the State contractually guarantees to pay to the New Entity (or its designee) for per-pupil State aid the greater of the total amount set forth below (which is based in part on DESE estimates and current year actuals as

13

 

indicated) or the total amount hereafter calculated based on

actual year-end figures for 1999-2000:

```
SB 781 Formula, Line 1
   (122,652/100 x $4.60)      = $5,641.99
Prop C                        = $   709.00 (DESE estimate for 1998-99)
Free Text                     = $    80.59 (actual for 1998-99)
Cigarette Tax                 = $    27.42 (DESE estimate for 1998-99)

            Total               $6,459.00
```

In addition, for each pupil qualifying for the free and reduced lunch

program, line 14 funding is also contractually guaranteed by the State in

the following minimum amounts per pupil:

```
SB 781 Formula, line 14a
   (122,652/100 x .2 x 2.75)  =     674.59
SB 781 Formula, line 14b
   (119,163/100 x .3 x 1.85)  =   $661.35

            Total               $1,335.94
```

In accord with the requirements of RSMo. §163.031.2, no deductions shall

be made for Proposition C, Free Textbooks or Cigarette Tax in making

these calculations for 1999-2000.

      (2)    For each year thereafter (subject to the temporal limit

set forth below in this paragraph 11), the State guarantees

contractually payment of the greater of the per pupil

amounts guaranteed for 1999-2000 less $465 per pupil

(which is a stipulated deduction solely for the purpose of

establishing a floor) or the amounts calculated for the then

current year.  Furthermore, the State guarantees

14

contractually that in any future year (subject to the temporal limit set forth below in this paragraph 11), the Formula items in the foregoing calculations (line 1, line 14a and line 14b) shall not be reduced below the amounts guaranteed for those items for 1999-2000 (less the aforesaid stipulated $465 per pupil).

(3)     In addition to these per pupil amounts, the New Entity shall also receive transportation aid from the State as provided in R.S.Mo. 162.1060(3)(2) and R.S.Mo. 162.1060(4)(2), and paragraph 13 of this Agreement.

(4)     Payments to the New Entity (or its designee) shall be made on the same schedule during the year as for school districts throughout the State.

(5)     Each of the foregoing amounts for transfer students shall be paid to the New Entity (or its designees) for the purposes indicated in R.S.Mo. 162.1060 and in paragraphs 20 and 21 of the Districts' Agreement and shall be so characterized as received by the Participating Districts from the New Entity.

11.4.   In making the calculations regarding the State's contractual guarantees in paragraphs 11.2 and 11.3, any statutory or administrative changes (for example, to the State Foundation Formula or any other source of State funding for schools or the definition of any factors used therein) having a disproportionate adverse



financial impact upon the County Districts, the New Entity (or its designee), or City Board shall be disregarded.

11.5.  Any changes regarding City Board (or any transitional overlay district) or their taxation/revenue status or structure (including regarding tax rates or penalty assessments) or pursuant to the contractual guarantees in paragraph 11.2 which have an adverse financial impact upon the County Districts, or the New Entity (or its designee) shall be disregarded in making the calculations in paragraph 11.3.

11.6   The guaranty commitments by the State in this paragraph 11 extend to all existing transfer students and to all new transfer students admitted during the next ten years (and thereafter through graduation from high school) and other SB 781 payments.  The State also contractually guarantees the two $25 million installments under SB 781 provided pursuant to Section 162.1060.4(1).

11.7   All of the amounts contractually guaranteed by the State in this paragraph 11 and, in general, all amounts payable by the State under this Agreement or under SB 781 (and the enactments made therein) which pertain to City to County or County to City transfer students shall be paid to the New Entity, or to any other designee of the Participating Districts, as described and set forth in the contemporaneous Agreement Among Participating School Districts (hereinafter "Districts' Agreement").

11.8   Funds generated by Gifted, Medicaid, Exceptional Pupil Aid and other sources identified by the New Entity shall, with respect to transfer students, be paid to the receiving districts providing the services for students qualifying under such programs and shall not be paid to the New Entity.  The New Entity shall

16

have all rights under R.S.Mo. 167.126 to collect and recover for a public

placement student any excess amount the New Entity pays to a receiving district

for such a student over and above the revenue otherwise received by the New

Entity on account of the student.

11.9    The parties agree that during 1999-2000, the State shall enter in the State

Foundation Formula for the City Board a property tax rate of no less than $4.60.

This tax rate shall be used on lines 1, 2 and 14 of the Formula for the City Board.

For all years thereafter, the tax rate entered in the Formula for the City Board

shall be the sum of the actual operating tax rate plus a sales tax equivalence tax

rate.  The sales tax equivalence tax rate is equal to the quotient of the prior

year's sales tax revenue actually received (except that a partial year's actual

receipts shall be annualized to represent a full twelve months) by the district

times 100 divided by the product of multiplying the prior year's total assessed

valuation times the prior year's tax collection rate.  The City Board shall annually

report to the State all information necessary for calculation of its tax rate to be

used for State Aid payment purposes.

11.10  If at any time the amount generated by the sales tax and the resulting

State aid produces less than $60 million (or its equivalent if SLPS enrollment

increases), the City Board's obligations under this Agreement shall be modified.

The Board will meet and confer with the Plaintiffs and United States before finally

determining which programs shall be reduced or eliminated.



12.    <u>INTERDISTRICT TRANSFERS</u> – Interdistrict transfers will continue as set forth in Appendices C and D, the Districts' Agreement, and the Agreement between the Plaintiffs and the County Districts.  The parties further agree that if the legislature discontinues the program as presently structured and funded, State funding will be provided as set forth in this Agreement to phase out the program and to allow then enrolled students to complete their education as set forth in Appendix A.


13.    <u>OTHER TRANSFER PROGRAM FUNDING</u> – The signatories agree that pursuant to RSMo. §162.1060(3)(2) and for the 1999-2000 and 2000-01 school years, the New Entity (or other designee) under the Districts' Agreement is entitled to receive the RSMo. §163.031(3) categorical add-on for transportation aid for participating students up to 125% of the State average approved cost per pupil.

To enable a workable transition to "zoned" busing, the State shall execute and agrees to honor the current status-quo City-County busing contracts for 1999-2000; provided, however, that to the extent the State's costs under the contracts exceed $23 million, the New Entity under the Districts' Agreement will be responsible for paying any excess (approximately $7 to $9 million); provided further that the Participating Districts or New Entity shall have the right to review and approve the current contracts before they are finalized.  The purpose of the State's and the Participating Districts' combined commitment to honor the current City-County busing contracts is to minimize disruption to transfer students and

18

their parents and to afford existing transfer students the opportunity to continue in their current schools for at least three years before being "zoned." The State agrees that each of the two $25 million payments for transportation under SB 781 will be paid promptly during the first month of each fiscal year. In lieu of honoring current busing-contract obligations as they accrue during 1999-2000 up to a maximum of $23 million, the State may make a single lump-sum payment in the amount of $21.5 million prior to March 15, 1999, to be held and disbursed by the New Entity (or other designee) for this purpose. To the extent the final total actual cost of the 1999-2000 busing contracts is less than $32.2 million, the New Entity will refund any savings in a check payable to the State delivered to the office of the Attorney General. The State at its own expense and with advance written notice to the New Entity (or its designee) may audit the expenditures under the busing contracts and the computation of any such savings. Any remaining XB3 capital requests being made by County Districts pursuant to the 1983 Settlement Agreement are outside the scope of this Agreement and must be resolved independently of this Agreement.

To further enable a smooth, speedy and workable transition with respect to the transfer program, the State agrees to transfer to the New Entity and/or Participating Districts under the Districts' Agreement, at fair market value or less (which, in the case of records, databases, files, information stored in any form and proprietary software, shall be zero), all or any selected items of property (whether tangible or intangible and including, without limitation, office premises, equipment, furniture, computers, software, databases, files and assignable or

19



assumable rights under contracts, leases or licenses) which the State owns or otherwise has an interest in and which are currently being used by the State or the Voluntary Interdistrict Coordinating Council to operate the transfer program in the desegregation case. Any agreements reached between the State and New Entity (or Participating Districts) with respect to the making of any such transfers of property shall be valid, enforceable and binding in accordance with their terms.

The signatories further agree that all transportation costs for student transfers under the Districts' Agreement shall be borne by the New Entity beginning July 1, 1999 as set forth therein, and to cooperate in smooth transitions thereafter with respect to transportation services.

14.   <u>OTHER FUNDS</u> - Nothing in this agreement limits or precludes the City Board or County Districts from receiving any state, federal, private or other funds they are otherwise entitled to absent this Agreement and, for purposes of such other funding, transfer students may be counted in the receiving district's enrollment. The City Board and County Districts will receive their share of increases in funding from all State and other sources on the same terms and conditions as all other Missouri school districts.

15.   <u>GRADE GROUPING</u> – The plaintiffs and the City Board agree that the grade grouping specified in Section 162.626 of SB 781 is inconsistent with the effective implementation of this Agreement.

20

16.    ACCREDITATION - If, at any time prior to June 2002, an evaluation of the

St. Louis Public Schools pursuant to lawful state standards and criteria results in

a recommendation to the State Board that the St. Louis Public Schools be

classified as unaccredited, the State Board will withhold making such a

determination or declaration until June 30 of the second full school year after

unaccreditation is recommended.  (For example, an evaluation of the St. Louis

Public Schools is scheduled in March 1999, the results of which are expected to

be conveyed to the State Board in September or October 1999.  If it is

recommended at that time that the St. Louis Public Schools be classified as

unaccredited, the State Board will not make such a declaration until June 30 of

the second full school year after the unaccreditation is recommended, or June

30, 2002.)  During the time period after which such an evaluation which

recommends unaccredited status is pending, and before the State Board makes

any such declaration, the City Board and State will work cooperatively to resolve

deficiencies and the City Board will retain its accredited status.  The

Commissioner of Education may, at his sole discretion, make reports to the State

Board as he deems necessary during this period.  In exchange for the State

Board's promise to delay action, the City Board agrees to cooperate fully with all

requests of the Commissioner for information and to provide this information

necessary to complete his reports.  The City Board also agrees to comply with all

educationally sound and administratively feasible recommendations of the

Commissioner or the State Board.  If the Board makes such a determination, the

21

Board and State will meet to work cooperatively towards resolving the matter. If the district is not making sufficient progress toward resolving deficiencies to allow a recommendation above unaccredited by the end of the second full school year after unaccreditation is recommended to the State Board, the State Board may declare the district unaccredited and take action. Accredited status will not be unreasonably withheld. In no event will the State Board declare the St. Louis Public Schools to be unaccredited at any time prior to the end of the 2001-02 school year. In the event the Missouri General Assembly amends § 162.1100 relating to time to cure deficiencies so as to provide the City Board two full or more years to correct deficiencies as is granted to all other Missouri school districts, and the State Board has delayed a vote on a State evaluation pursuant to the terms of this Agreement, the parties agree that, for purposes of any new law, the time period in the amended law shall be calculated beginning as of the date the vote would have been taken by the State Board on the recommendation that the St. Louis Public Schools be classified as unaccredited as a result of an evaluation of the St. Louis Public Schools pursuant to lawful state standards and criteria.

17.     <u>VOCATIONAL EDUCATION</u> – In addition to the provisions stated in this Agreement, this vocational education agreement is also entered into by the signatories to replace the substantive and financial obligations placed upon the Special School District of Saint Louis County [hereinafter "SSD"], by all previous

22

orders in the <u>Liddell</u> litigation; including all orders and opinions entered by the United States Court of Appeals for the Eighth Circuit.

This Agreement is intended to serve as a final judgment as to SSD in the <u>Liddell</u> litigation and to terminate the continuing jurisdiction and supervision of the Court over SSD, subject to the provisions of this Section 17.  The Court's final order shall grant final judgment and dismissal with prejudice to SSD and its officers, thus terminating the Court's jurisdiction over SSD and its officers.  In the event of a dispute between the Plaintiffs (including the United States) and SSD, the Plaintiffs may seek to compel specific performance of the terms of the vocational education agreement in federal court, but Plaintiffs' rights in any such claim shall be limited to such a claim for specific performance, and the parties agree that shall be the only purpose and basis for any further action by this Court.  In the event that a court determines that SSD breached the vocational education provisions of this Agreement, Plaintiffs also shall be entitled to recover the costs of obtaining compliance, including an award of reasonable attorneys fees and costs.  The parties hereby agree to waive and dismiss all rights to any further relief from this Court.

This Agreement shall be effective only if (1) SSD, the State of Missouri and City Board each receive a final non-modifiable judgment and is released as a party to this case; (2) this Agreement and all Appendices are expressly approved by the Court as requested by the parties; and (3) the funding provisions set forth herein occur as provided.



The Liddell Plaintiffs and the Caldwell-NAACP Plaintiffs (hereinafter "the Plaintiffs"), the United States, the SSD and the City Board agree as follows:

A.    <u>Vocational Education Cooperative.</u>  Pursuant to Section 178.490 R.S.Mo., SSD and City Board shall establish a Metropolitan Vocational Technical Cooperative to establish and maintain vocational and technical education programs for children under the age of twenty-one who reside in St. Louis City and St. Louis County:

1.    The cooperative shall provide a metropolitan vocational program of instruction that complies with State standards relating to vocational education;

2.    The program shall provide half-day vocational credit and vocational and academic credits for full-day students to receive a high school diploma at the completion of the twelfth grade; and sufficient to qualify for State and federal funding.

B.    <u>Governance</u>.  The cooperative shall be governed by a seven-member board of directors (hereinafter "the cooperative board"). The members of the cooperative board shall be as follows:  (1) the SSD superintendent or his/her designee; (2) three county district superintendents selected by the SSD governing council; (3) the SLPS superintendent or his/her designee; (4) a voc-tech educator/specialist selected by the City Board; and (5) a voc-tech educator/specialist selected by the Liddell and Caldwell-NAACP Plaintiffs.

1.    The cooperative board shall be in place no later than June 1, 1999 and shall begin its duties as of July 1,1999.  The

24



programming and budgets for the 1999-2000 school year shall be the respective responsibilities of the SSD and City Board and these parties shall seek to maintain the programmatic and budgetary status quo to the extent practical for the 1999-2000 school year.

2.     The cooperative board shall appoint a Director for vocational and technical education who shall be the chief administrative officer of the vocational and technical education program of the cooperative.

3.     The cooperative board shall determine if additional administrators (such as Assistant Directors) are needed to effectively operate the vocational and technical programs established by the cooperative.

4.     The cooperative board shall be responsible for the following: (1) student selection and assignments; (2) establishing programming; and (3) student transfer process.

5.     Any decision of the cooperative board relating to (a) the duplication of vocational education programs at multiple sites, (b) a modification of the current level of full-day programming, or (c) a determination as to whether a proposed school closing adversely affects the delivery of vocational education programs in the metropolitan area, shall require a majority vote of the cooperative board with at least one member of that majority being a board member as identified in (B)(1) or (2) and at least one member of

 

that majority being a board member as identified in (B)(3), (4) or (5).

6.     SSD shall operate the vocational-technical facilities and programs in St. Louis County, in accordance with the student selection and assignments, programming and student transfer directives of the cooperative board.

7.     City Board shall operate the vocational-technical facilities and programs in St. Louis City in accordance with the student selection and assignments, programming and student transfer process directives of the cooperative board.  City Board shall assume the operation of the Career Academy located in the City of St. Louis as of July 1, 1999.

8.     The cooperative board shall develop and adopt an annual budget for vocational and technical education; including the cooperative board's operating expenses.  The cooperative board shall strive to keep its expenses to a minimum, including consideration of housing its administrative staff in either SSD's or City Board's facilities.  The cooperative board's expenses, once approved, shall be paid by SSD and City Board in proportional shares based upon student participation in the cooperative's vocational programs.  The cooperative board shall submit its budget to the SSD, City Board and the SSD governing council for

 

review, consideration and approval no later than April 1, prior to the start of each fiscal year.

9.      The cooperative board shall annually develop, review and approve a rolling five-year plan for the operation and management of the cooperative.

10.     A Cooperative Parent Advisory Council, similar to the Parent Advisory Council established in Section 162.858 R.S.Mo., will be established.  There will be ten (10)parents, five (5) parents of Saint Louis City resident vocational education students and five (5) parents of Saint Louis County resident vocational education students.

11.     All signatories desire that the Missouri State Legislature amend Section 162.857 R.S.Mo. to eliminate the current end date on SSD's ability to provide vocational education and enable SSD to maintain its AVTS status and all signatories are supportive of such legislative action.

12.     The cooperative shall continue in existence for a period of no less than six years from the date of this Agreement; at which time, the cooperative may continue in existence thereafter upon agreement of the SSD and City Board; or those parties may continue to operate their own sites as individual AVTS providers. The signatories anticipate that the Joint Legislative Committee on Vocational Education may review the vocational technical

27

education program in the metropolitan area six years from the date
of this Agreement.

    a.    Eligible students enrolled in the vocational education
program of the cooperative at any time will have the
opportunity to continue in the program through graduation or
completion. If under the terms of this Agreement, the
cooperative ceases to exist, vocational education students in
programs operated hereunder will be allowed to complete
the vocational technical program in which they are enrolled.

C.    <u>Funding.</u>  The cooperative board, with the assistance and
cooperation of the SSD and City Board, shall establish a per pupil cost for each
pupil enrolled in its vocational technical programs minus the federal and state aid
and private grants that may be available (hereinafter per pupil rate).  The per
pupil rate shall be subject to final approval by the City Board, SSD Board and the
SSD governing council.  Any disputes regarding the per pupil rate shall be
resolved by DESE pursuant to State law.

    1.    As anticipated by SB 781, the New Entity established
pursuant to the provisions of SB 781, the Settlement Agreement
and the Agreement Among Participating Districts, shall receive at
least the same eligible pupil amount from the State for vocational
education transfer students as it receives for general academic
education students. The New Entity shall place such funds,
exclusive of those funds received for transportation and exclusive



of any transportation "cost difference" amount as set forth in subparagraph F below (hereinafter the disbursement amount), in a vocational education account.  The New Entity shall pay this disbursement amount to the sending district.  For purposes of this paragraph 17, City Board is the sending district for City resident students attending programs at SSD's facilities and SSD is the sending district for County resident students attending programs at a City Board vocational facility.

2.     The sending district shall pay the per pupil rate to the receiving district.  For example, for each City resident eligible pupil attending SSD's vocational facilities, the City Board shall receive the disbursement amount from the New Entity and will then pay the full vocational education per pupil rate to SSD for each eligible pupil.  Conversely, for each County resident eligible pupil attending City Board's facility, SSD shall receive the disbursement amount from the New Entity, and will then pay the per pupil rate to the City Board for each eligible pupil.  This funding applies to both full and half-day vocational education eligible pupils.

D.     <u>Operation of Vocational Technical Education Buildings</u>.  SSD and City Board shall each retain complete ownership and control over their respective facilities, revenues and expenditures.  The SSD and the City Board shall have ownership and control of all of their respective real and personal property used for vocational education programs.  The SSD and the City Board

29

shall have the right to sell any such real and personal property used for vocational education programs, to another entity or transfer to another use, provided that the SSD and City Board shall first obtain the determination of the vocational cooperative board that any sale or transfer for use of such property shall not adversely affect the delivery of vocational education programs in the St. Louis Metropolitan area.

1.     SSD and City Board shall be responsible for normal ongoing maintenance of their respective facilities.

2.     SSD and the State shall each pay $55,083.33 to City Board by March 14, 1999; as their one-third share of the previously court-ordered cost to renovate the Southwest High School for next year. SSD shall have no further financial responsibility for the renovation of Southwest High School or any other facility to be used as the City vocational high school, other than that specified in paragraph (D)(4).

3.     The City Board shall develop a comprehensive vocational high school in the City of St. Louis which shall accommodate the following programs: technology; agriculture and natural resources; human services; health services; business systems; and construction trades.  Additional programming decisions shall be made by the cooperative Board, including implementing at least three additional programs at the City vocational high school.  The



school shall be constructed in conformity with area standards for
school construction.

4.      SSD and the State shall each pay to City Board the sum of
$9,666,624 each for said vocational high school with the payment
schedule to be as follows: (1) The State shall make one lump sum
payment of $9,666,624 to City Board on March 14, 1999; and (2)
SSD shall make three equal payments of $3,222,208 each to City
Board with the first payment due on October 1, 2001, and the
second due on September 1, 2002; and the third due on
September 1, 2003.

      a.      City Board shall credit or reimburse SSD and the
      State for their one-third share each of any cost savings
      and/or reduction in total project costs below $28,999,870.

5.      The parties agree that City Board shall build a four-year
comprehensive vocational high school in the City.  City Board shall
submit to plaintiffs by September 1, 1999 plans including a
description of the site and construction project, the timetable for
commencement, construction, and project completion.  If City
Board has not either built a new comprehensive vocational high
school by September 1, 2004 or encumbered the funds received
from SSD and the State for the construction of a new
comprehensive vocational high school, then City Board shall return

the funds received pursuant to paragraph D (4) above to SSD and the State within 60 days.

6.     SSD and City Board shall retain their employment relationship with their vocational technical employees. City Board may, in its discretion, become the employer of the Career Education District's vocational technical employees currently teaching in the Career Academy. Any decision regarding employee hiring and/or termination shall be made cooperatively between the employing school district (either SSD or City Board) and the cooperative board, but shall finally rest with the employing district.

E.     Centralized Support Services.  In order to avoid duplication of expenditures, the cooperative board may contract with a fiscal agent to provide centralized support services for vocational and technical education.  Any such services provided to the cooperative shall be budgeted and paid by the cooperative.  The SSD, the City Board, or other educational entity may act as fiscal agent and provide central support services to the cooperative.

F.     Transportation.  For at least six years, transportation for vocational education transfer students between the City and the County shall be part of the overall student transportation program established pursuant to SB 781, this agreement and the agreement Among Participating Districts. The New Entity shall provide transportation for vocational education transfer students, as it will for general academic transfer students, for at least six years and subject to the terms and conditions of the Agreement Among Participating Districts.  For years

32

four, five and six of the cooperative's existence, if the cost to transport the

vocational education transfer students exceeds the SB 781 per pupil

transportation aid amount that the New Entity receives from the State for such

students, then the New Entity can pass that cost difference to the sending district

as a deduction from that district's per pupil reimbursement.  Continuation of

transportation for vocational education transfer students after the sixth year shall

be subject to the New Entity's further consent and agreement.  In the event the

New Entity ceases to provide transportation for vocational education transfer

students, the district providing said transportation shall receive 155% of the State

average in accordance with SB 781, or higher if provided for by other State law

or by this Agreement or its Appendices.

  G. All school districts shall have authority to operate vocational

educational programs in comprehensive high schools in addition to the programs

of the cooperative and such programs are not under the authority of the

cooperative.  The City vocational school site is not a comprehensive high school

for purposes of this paragraph (G).


18. <u>TRANSITIONAL DISTRICT</u> – (a). The parties agree, and the Court's order

approving this Agreement shall state, that:

  1. the education programs and policies set forth in this Agreement are

programs and policies needed in providing for a transition of the

educational system from the control and jurisdiction of the Court; however,

the City Board may, in its discretion, determine additional programs and
policies that are needed for such a transition;

2.      all programs and policies set forth in the Agreement are the sole
responsibility of the elected City Board;

3.      the Transitional District shall have no responsibility or authority to
carry out any such programs or policies, unless otherwise determined by
the City Board;

4.      the revenues from any and all taxes imposed through a ballot
measure submitted by the Transitional District, and any resulting State
and federal aid, (excluding any attributable to transfer students) shall be
unconditionally assigned to the City Board upon receipt by the Transitional
District.

(b).     After the sales tax becomes effective, the State Board agrees, at any time
prior to July 1, 1999, to make a determination that the Transitional School District
of the City of St. Louis has accomplished the purposes for which it was
established and is no longer needed.  Upon such a determination, the
Transitional District is dissolved and any and all taxes and other receipts
approved for the Transitional District are assigned to the City Board.  The State
Board shall provide notice to the Governor and the general assembly of the
termination of the Transitional District, and the termination shall become effective
thirty days following the State Board's determination.  The Transitional District
may be reestablished as permitted by state statute.

34

19.   <u>MONITORING AND SUPPORT</u> –  The parties will cooperate in monitoring this Agreement and in seeking community support for achieving its objectives, particularly the goal of improving the academic performance of students.  Toward this end, the parties will endeavor to establish a community monitoring and support task force consisting of representatives of the parties, of parent groups, of the business community, of colleges and universities, of teacher organizations, and of other community representatives.  The Task Force will secure information and inform the public on the progress of the Agreement, make recommendations for needed actions, and help to secure additional resources and the cooperation of individuals and groups needed to make the Agreement effective in improving public schools and student performance.

20.   <u>FISCAL YEAR 1999 FUNDING</u> –The signatories recognize that SB 781 envisioned continuation of the State's funding obligations for FY 99.  The State contractually agrees to meet existing funding obligations for FY 99 as specified in various court orders.  Therefore, the State shall pay to the City Board the amount of $39,685,458.75  no later than March 14, 1999 which is the remainder of the State's expected financial obligation, other than capital obligations to the City Board under Court order for Fiscal Year 1999.  The State's obligation for FY 99 shall not be increased.  Following an independent audit of FY 99 expenditures, the City Board and State shall agree whether the City Board should refund monies for FY 99 to the State based upon the principles used in prior years in year-end reconciliation between the City Board and State.

Pursuant to Liddell v. Board of Education of the City of St. Louis, 142 F.3d 1111 (8th Cir. 1998), the State will also pay to City Board no later than March 14, 1999 the amount of $203,773.67 as satisfaction of the Court of Appeals' mandate.

Similarly, the State will pay to the County Districts (or their designee) the amount of $47,255,673 no later than March 14, 1999 which is the remainder of the State's expected obligation to the County Districts (including approximately $8 million owed to SSD) under Court orders for FY 99 and in addition to amounts paid per pupil from State Aid for such students. The State's obligation for FY 99 shall not be increased. Within one year after the end of FY 99, the County Districts and State shall agree whether the County Districts should refund monies for FY 99 to the State based upon principles used in prior years in year-end reconciliation between County Districts and the State. Either side may request an independent audit at its expense, with advance written notice of such request to be provided.

Similarly, the State will pay to the New Entity (or other designee) under the Districts' Agreement the amount of $387,504 no later than March 14, 1999 which is the remainder of the State's expected obligation to VICC under Court orders for FY 99. The State's obligation for FY 99 shall not be increased. Within one year after the end of FY 99, the New Entity and State shall agree whether monies for FY 99 should be refunded to the State based upon principles used in prior years in year-end reconciliation between VICC and the State. Either side

may request an independent audit at its expense, with advance written notice of such request to be provided.

The State will pay to the New Entity (or other designee) the amount of $25,000,000 no later than March 14, 1999 which is the remainder of the State's expected obligation for the City to County and County to City transportation contracts under court orders for FY 99. If this amount is insufficient to cover these contractual obligations, the State will directly pay to the contracting parties the balance due under these contracts in an amount not to exceed $35,000,000 for the entire FY 99. The State's obligation for FY 99 shall not be increased beyond these amounts. Within one year after the end of FY 99, the New Entity and State shall agree whether the New Entity should refund monies for FY 99 to the State because the amount received by the New Entity exceeded the actual cost of the contracts. Either side may request an independent audit at its expense, with advance written notice of such request to be provided.

The signatories further agree that, in lieu of making such lump-sum payments as aforesaid, the State may, if it so elects, simply continue honoring and paying the above-described FY 99 liabilities to the respective recipients and obligees as they accrue in the ordinary course, in accord with existing customs, practices and procedures regarding the timing, manner and reconciliation of such payments. If the State elects to proceed in this fashion, rather than making the accelerated lump-sum payments, then: (1) the State thereby contractually guarantees to honor all such FY 99 obligations and to pay them timely as they accrue; (2) the total of all such payments by the State shall not in the aggregate

exceed the total of the lump sum amounts provided for above; and (3) any further agreements reached between the State and New Entity (or the Participating Districts or their designee) with respect to proceeding in this fashion shall be valid, binding and enforceable in accordance with their terms.

The State shall pay in a lump sum to the New Entity (or its designee) on or before March 15, 1999, the sum of $9,046,059 which constitutes the special education Phase I reimbursements awarded to SSD pursuant to Court Order L(43)98 dated July 13, 1998.  The New Entity shall disburse said funds to SSD in accordance with the provisions in paragraph 22.5 of the Agreement Among Participating School Districts.

21.    PROVISION OF DATA - The City Board will make available data to the plaintiffs and United States concerning the matters contained in this Agreement for a period of ten years.  There will be no Court reporting or Court monitoring.

22.A. FINAL JUDGMENT

1.    Definition.    "Expanding (or expand) the State's obligation" as used herein shall mean any financial or other obligations in excess of the specific obligations of the State of Missouri and its individual defendants that are set out in this agreement.  Those specific financial obligations include only the following; (1) Funding to SLPS under SB 781; (2) Funding to the New Entity or Participating Districts under SB 781 as guaranteed in this Agreement; (3) Capital payment to SLPS including one-third of the renovation costs of Southwest High

38

School as required by the Court of Appeals order in vocational education,  149

F3d 862 (1998); (4) Transportation and FY 99 payments to New Entity,

Participating Districts, transportation contractors and/or other recipients or

obligees; (5) the obligations listed in 22.A.(2) below.  With the exception of

22.A.1.(5), the amounts of those specific financial obligations are set out in this

agreement and in SB 781 and constitute the only financial obligations of the

State of Missouri under this agreement and the only remaining obligation of the

State of Missouri in this case.

2.      This Agreement is intended to resolve finally and fully the matter of

Craton Liddell et al. v. The Board of Education of the City of St. Louis, et al., No.

72-100-C, presently pending in the United States District Court for the Eastern

District, Eastern Division.  Upon execution of this Agreement and final approval

following a fairness hearing, the parties shall file a joint motion to dismiss this

action with prejudice.  This order shall grant final judgment and dismissal with

prejudice to the State and City Board and dismiss the case against the State and

City Board with prejudice.  After entry of the Order of dismissal with prejudice,

the obligations of the State of Missouri and its officers shall be limited to the

following: (a) compliance with prior court orders through the 1998-99 school year

b) an award of reasonable attorney fees and costs, and c) the payment of

obligations incurred pursuant to the provisions of this Agreement and, in the

event of a breach of this Agreement by officials of the State of Missouri, the cost

of obtaining compliance including an award of  reasonable attorney fees and

costs.  In the event of a breach of this Agreement by the City Board defendants,



plaintiffs shall also be entitled to recover the costs of obtaining compliance, including an award of reasonable attorneys fees and costs.

3.      Promptly after execution of this Agreement, the parties will apply to the Court for notice and scheduling of a fairness hearing, pursuant to Fed.R.Civ.P.23, to determine whether the Agreement is fair and reasonable.  If the Court approves the Agreement under Fed.R.Civ.P.23, the State and its officers and the City Board and its officers will be dismissed with prejudice from this action, thus terminating the Court's jurisdiction over the State and its officers and the City Board and its officers.


## 22.B.  REMEDIES IN THE EVENT OF BREACH

1.      In no event shall any party to this action have any continuing rights in this action against the State or City Board Defendants other than a claim for specific performance, in the event of a breach of this Agreement.

2.      In the event of a dispute between or among the State of Missouri, the City School Board, the Suburban districts, and all other officers, agents, agencies and subdivisions of the State concerning their contract obligations, the matter shall be adjudicated only in State Court.  Any relief in such an action shall be limited to specific performance of the Agreement.  Venue for such an action brought by any suburban district(s) will be proper only in the Circuit Court of St. Louis County.  Venue for such an action brought by the City Board will be proper only in the Circuit Court of the City of St. Louis.

 

3.     In the event of a dispute between the State of Missouri or State and City Board defendants and the plaintiffs (including the United States) the plaintiffs may seek to compel specific performance of the terms of this agreement in federal court, but plaintiffs' rights in any such claim shall be limited to such a claim for specific performance, and the parties agree that shall be the only purpose and basis for any further action by this Court after the Court's approval of this agreement.  The parties hereby agree to waive and dismiss all rights to any further relief from this Court.

4.     The Parties agree that, following approval of the settlement agreement, the remaining obligations of the State of Missouri are solely financial and are limited to those set forth in the settlement agreement.  The parties will not seek to expand the State's or City Board's obligation set forth in the Agreement or to seek any other relief not authorized by the Agreement.  Parties will oppose the effort of any entity, whether or not a party to this litigation to obtain such relief in any venue.  The parties agree that the State of Missouri shall have no obligation to enforce the obligations of any other party to this settlement agreement.  With respect to any element of the State's or City Board's performance other than its obligations to pay money, such obligations may only be enforced by the signatory to this agreement to whose benefit that performance is most directly intended and by no other person regardless of whether that person asserts, believes, or demonstrates that they are the person for whose benefit that obligation was intended.  Failure of any party other than the State to perform its obligations under this Agreement (including, but not

41

limited to, the City Board's obligations relating to student achievement and performance) shall create no obligation on the State of Missouri other than exists under State law.

Similarly, the State will not seek in any proceeding to limit or to diminish the financial relief provided for under the agreement.

5.     Before any motion requesting specific performance is filed with any court by any party, the party who alleges breach of the agreement shall notify the Attorney General of any alleged breach.  Such notice will be given within 90 days of when the party learns of the action which is alleged to constitute a breach. Notice shall include a detailed explanation of the action which is alleged to constitute the breach.  The Attorney General shall provide prompt notice to the other parties of any action in the General Assembly that threatens a breach and shall seek to prevent the breach from occurring.  If the alleged breach was committed by an action of the General Assembly, the Attorney General shall promptly forward notice of the alleged breach to the Speaker of the Missouri House and the President Pro Tem of the Missouri Senate.  No party shall file any pleading with a court until the General Assembly has had sufficient opportunity to repeal or otherwise remedy any action complained of.  Sufficient opportunity as used in this section means at least one calendar year from the date the Attorney General transfers notice to the General Assembly, provided that no interruption of funding takes place or is imminent.  If the alleged breach was committed by an official other than the General Assembly, the parties shall notify the Attorney General who shall promptly transmit notice to the official who is alleged to be in

breach.  No further action shall be taken by any party until the official has had 90 days to cure the alleged breach, provided that no interruption of funding takes place or is imminent.

6.     All Parties recognize that the resolution of this lengthy controversy without further litigation will require their continuing cooperation.  If anyone not a party to this Agreement shall seek relief that would be inconsistent with the Agreement, all parties will take any steps needed to defend the Agreement.  The plaintiffs pledge their full cooperation with the State of Missouri in prohibiting any expansion of the State's obligations outside of the express terms of this agreement.  Such cooperation shall include, but not be limited to, any or all of the following: A.) Filing a joint appeal or motion for re-hearing of any court order that expands the state's obligations. B.) In the event a party other than the state is unable to fulfill its obligations under this agreement, all parties agree that such circumstance shall not constitute a change in facts or circumstances that would justify a change in or modification of this agreement or any court's orders based thereon or incorporating or referencing this agreement, and all parties shall take the position that the State's financial obligations shall not be increased, even if the result would be curtailment, cessation or elimination of such programs. C.) In the event a court enters an order expanding the State's obligations the plaintiffs agree that, consistent with their ethical obligations to their clients and their responsibilities as officers of the court, they waive any right to any benefit that might result from such an order and hereby agree to take no efforts to collect any such funding from or enforce any additional obligation against the State of

43

 

Missouri.  D.) The plaintiffs also agree that they will jointly oppose and exhaust all levels of available appeal in an effort to reverse any order by a court that expands the state's obligations, including but not limited to, appeals, motions for rehearing and rehearing en banc, and petitions for a writ of certiorari.  Any participation by the United States in any appeal referenced herein is subject to the independent authority of the Solicitor General .

In any pleading filed with any court after entry of dismissal with prejudice, the parties shall include the language of this paragraph verbatim.  This provision may be fulfilled by attaching a copy of this paragraph and incorporating it by reference into the pleading.

7.     In the event any party takes any action, including but not limited to filing a motion, supporting a motion or in any other way seeking to expand the State's, City Board's or SSD's obligations or financial supporting such an expansion, that party shall pay the reasonable costs and attorneys' fees incurred by the State of Missouri and all other parties to this Agreement and Appendices hereto in defending against such action.

8.     The parties agree that, after the entry of a final judgment dismissing the case with prejudice, in accordance with the terms of this agreement, no party shall file a motion to alter or amend the District Court's order for any reason whatsoever.  All parties agree to oppose any motion to alter or amend the order.

9.     The parties agree that this settlement agreement represents the sole obligation of the State of Missouri and City Board as remedy for any past

acts of discrimination, that gave rise to this litigation to the present day and through the period of performance envisioned hereunder, by any present or former defendants or others who could have been defendants to this action. In addition, performance under this agreement by the State and City Board shall not constitute, nor shall any party hereto assert that such performance constitutes, a constitutional or civil rights violation by the State or anyone whose acts are attributable or chargeable to the State and City Board, and if any third party makes such an assertion in any form or forum whatsoever, all parties will defend the Agreement.

23.    RELEASES AND OTHER PROVISIONS REGARDING COUNTY DISTRICTS - Notwithstanding anything in the provisions of this Agreement to the contrary, the signatories further agree as follows, conditional upon the Court's approval of this Settlement Agreement and entry of a final judgment in the Desegregation Case no later than March 15, 1999:

a.    The parties and each of them fully, generally and forever release and discharge the County Districts and each of them from any and all claims, obligations or liabilities of any kind whatsoever based upon or arising out of the Desegregation Case or any matters alleged therein, including without limitation any individual or class claims alleged against the County Districts or any of them, and further including any obligations under any orders of court, decrees or judgments or under the 1983 Settlement Agreement, which agreement the parties do hereby stipulate is fully and forever concluded and without further

45

force or affect as to the County Districts and each of them; provided, however, that the Districts' Agreement, and the contemporaneous Agreement Between County Districts and NAACP, Liddell Plaintiffs and United States (hereafter "Agreement of Certain Parties") are excepted from the foregoing provision and remain valid and effective in accordance with their terms.

b. The final judgment in the Desegregation Case shall dismiss with prejudice all claims and the entire case as to the County Districts and each of them, shall be nonmodifiable as to the County Districts and each of them, and shall completely and immediately end any and all court supervision as to the County Districts and each of them.

c.     The parties and each of them specifically approve, consent to and waive any objections to the Districts' Agreement,  the Agreement of Certain Parties and all provisions in either of those two agreements.

d.     Apart from obligations contained in the Districts' Agreement and the Agreement of Certain Parties and SSD's obligations under paragraph 17 of this Settlement Agreement, the County Districts, after entry of the final judgment as aforesaid, shall have no executory or continuing obligations of any kind under or with respect to this Settlement Agreement.

e.     The parties and each of them covenant, agree and stipulate that (i) the mere termination of or reduction of participation in the transfer plan at any time if done in conformity with the provisions in the Districts' Agreement, the Agreement of Certain Parties or paragraph 17 of this Agreement shall not serve as the basis for any claim or lawsuit against any County District or the New

46



Entity, (ii) the taking of any other action at any time authorized in accordance with the rights and options granted in any of those agreements shall not serve as the basis for any claim or lawsuit against any County District or the New Entity, (iii) any adverse impact created by any termination of or reduction of participation in the transfer program or the taking of any other action in conformity with the provisions in the Districts' Agreement, the Agreement of Certain Parties and paragraph 17 of this Agreement, at any time, shall not serve as the basis for any claim or lawsuit against any County District or the New Entity, and (iv) the future continuation of any conduct, custom or practice permissible under the 1983 Settlement Agreement shall also not serve as the basis for any claim or lawsuit against any County District or the New Entity.

      f.    The provisions in this paragraph shall remain unconditionally and irrevocably effective and enforceable in accordance with their terms.

24.    <u>EFFECTIVE DATE</u> – This Agreement shall become effective upon the Court's entry of a final judgment in this case.

25.    <u>APPEALS</u> - All signatories agree not to appeal the decision of the District Court approving this Agreement provided that the order is consistent with this Agreement.

BOARD OF EDUCATION OF THE
CITY OF ST. LOUIS

By: _Marlene E. Davis_
     Marlene Davis, President of the
     Board of Education

Lashly & Baer, P.C.

By: _Kenneth Brost_
     Kenneth C. Brostron
     Dirk DeYong
Attorneys for the Board of Education of the
City of St. Louis

STATE OF MISSOURI

By: _____
     Jeremiah "Jay" Nixon
Attorney General for the State of Missouri

LIDDELL PLAINTIFFS

By: _____
     William Douthit
Attorneys for Liddell Plaintiffs

CALDWELL/NAACP PLAINTIFFS

By: _William Taylor by Veronica Johnson_
     William L. Taylor, Dianne Piche
     Michael A. Middleton
     Veronica Johnson
Attorney for Caldwell/NAACP Plaintiffs

UNITED STATES OF AMERICA

By: _Jeremiah Glassman_
     Jeremiah Glassman
Attorney for United States of America

47-A

Affton School District

By _____
/Superintendent

Bayless School District

By: *James W. Duchowski*
Superintendent

Brentwood School District

By        _Keith Falkenberg_
           President, Board of Education

SCHOOL DISTRICT OF CLAYTON

By _____

President, Board of Education

47-E

 

FERGUSON REORGANIZED SCHOOL DISTRICT, R-II

By: _____

Dr. Stan Scheer, Superintendent



**SETTLEMENT AGREEMENT**

HANCOCK PLACE SCHOOL DISTRICT

BY _____
Arthur J. Schomaker, President

_____
Al Bourisaw, Superintendent

47-G

HAZELWOOD SCHOOL DISTRICT

By _____

Vice President

 

Jennings School District

By: _____
      Superintendent

KIRKWOOD SCHOOL DISTRICT R-7

By: _Rick Stream_

Board President

47-J

SCHOOL DISTRICT OF THE CITY OF LADUE

by: _____
        President of the Board of Education

LINDBERGH SCHOOL DISTRICT
By:

Frank Gregory, President
Board of Education
Lindbergh School District

Dated:  February 18, 1999

 

**APPROVED AND ACCEPTED:**

MAPLEWOOD RICHMOND HEIGHTS SCHOOL DISTRICT

By: _Albert W. Burla_____

     **Superintendent**           **(Title)**

MEHLVILLE SCHOOL DISTRICT

By _Candy Green_, President
(title)

47-N

Normandy School District

By: _____

Board President



Parkway School District

By _Sue Hockersmith_
President, Board of Education

47-P

**Pattonville School District**

By _(signature)_
Robert W. Dillon, Sr., Board President

RITENOUR SCHOOL DISTRICT

By Paul W. Daerrer, Superintendent
(title)

47-R

School District of Riverview Gardens

By: _____
          Board President

Rockwood School District

By _Deborah A. Fluchel_
President, Board of Education

SPECIAL SCHOOL DISTRICT OF ST. LOUIS
COUNTY

By: _____
              President of the Board

University City School District
St. Louis County, Missouri

By: _____
    Attorney for
    University City School District


Settlement Agreement




WEBSTER GROVES SCHOOL DISTRICT

By: _Ellen Chapman_
Ellen Chapman, President of the
Board of Education


Copeland, Thompson & Farris, P.C.

By: _Douglas A. Copeland_
Douglas A. Copeland
Attorneys for Webster Groves School District


VALLEY PARK SCHOOL DISTRICT
Copeland, Thompson & Farris, P.C.

By _Douglas A. Copeland_
Douglas A. Copeland
Attorneys for Valley Park School District

Wellston School District

By: _____
        Superintendent

**APPENDIX A**

 

## APPENDIX A

### Schedule for PhaseOut of
### Interdistrict Program if Terminated
### By Legislature in 2008*

| Year | Program Does Not Serve | Program Serves |
|------|------------------------|----------------|
| 2009-10 | Kindergarten | G 1-12 |
| 2010-11 | K, G1 | G 2-12 |
| 2011-12 | K, G1, G2 | G 3-12 |
| 2012-13 | K, G1, G2, G3 | G 4-12 |
| 2013-14 | K, G1, G2, G3, G4 | G 5-12 |
| 2014-15 | K, G1, G2, G3, G4, G5 | G 6-12 |
| 2015-16 | K, G1, G2, G3, G4, G5, G6 | G 7-12 |
| 2016-17 | K, G1, G2, G3, G4, G5, G6, G7 | G 8-12 |
| 2017-18 | K, G1, G2, G3, G4, G5, G6, G7, G8 | G 9-12 |
| 2018-19 | K, G1, G2, G3, G4, G5, G6, G7, G8, G9 | G 10-12 |
| 2019-20 | K, G1, G2, G3, G4, G5, G6, G7, G8, G9, G10 | G 11-12 |
| 2020-21 | K, G1, G2, G3, G4, G5, G6, G7, G8, G9, G10, G11 | G 12 |
| 2021-22 | Program Terminated | |

*Schedule parallels schedule contained in Section 162.1060.1 of SB 781, adding Kindergarten

 

**APPENDIX B**

## APPENDIX B-1

Revenue Changes from SS SCS SB 781 for SLPS for the Year 1999-2000 (Summary of Net Changes is in Bold in SB781 Effect Column)

| Formula Element | Current Formula | Current Total | SB781 Formula - SLPS | SB781 Total - SLPS | SB781 Effect - SLPS |
|---|---|---|---|---|---|
| **Line 1:** | | | | | |
| Ln 1 (a+b): EP * Levy * GTB * Prorate | 40473 * 3.75 * 1225.0 * 1 | 185,922,844 | 40473 * **4.60** * 1225 * 1 | 228,065,355 | 42,142,511 |
| Ln 1 Phantom Payments (incremental) | 5781 * 3.75 * 1225.0 * 1 | 26,556,469 | **0** | 0 | -26,556,469 |
| Total Line 1 | | 212,479,313 | | 228,065,355 | 15,586,043 |
| | | | | | |
| **Deductions:** | | | | | |
| Ln 2 (a): <AV/94/96 * Income F * Levy | 26964388.7 * .9358 * 3.75 | 94,624,781 | 26964388.7 * .9358 * **4.60** | 116,073,065 | 21,448,284 |
| Ln 2 (b): (98AV-94AV) * Income F * Levy | 82179 * .9358 * 3.75 | 288,387 | 82179 * .9358 * **4.60** | 353,754 | 65, |
| Ln 3 - Ln 9 (RR, Fed, Cig, Prop C, etc.) | | 23,421,196 | | 23,421,196 | 21,513,651 |
| Ln 10: Total Deductions (Sum 2-10) | | 118,334,364 | | 139,848,015 | |
| | | | | | |
| Basic Formula Amount (Line 1 - Line 10): | | 67,588,480 | | 88,217,340 | 20,628,860 |
| Formula $ excluding phantom payments | | 26,556,469 | | 0 | -26,556,469 |
| Phantom Payments | | 94,144,949 | | 88,217,340 | -5,927,609 |
| Total Formula Amount | | | | | |
| | | | | | |
| Ln 14: Free/Red Count * .2 * GTB * 2.75 | 35371 * .2 *1225.0 * 2.75 | 23,831,211 | 35371 * .2 * 1225.0 * 2.75 | 23,831,211 | 0 |
| Ln 14(b): F/R Ct * .3 * GTB * (Levy - 2.75) | | 0 | 35371 * .3 * 1191.63 * **(4.60-2.75)** | 23,392,775 | 23,392,775 |
| Total State Formula (Ln 1 - Ln 10 + Ln 14) | | 117,976.160 | | 135,441.327 | 17,465,1.. |
| | | | | | |
| **Local Revenue Enhancement:** | | | | | |
| Property Tax or Sales Tax Increase (est.) | | 0 | **assessed val*collect rate * 4.6** | 21,448,284 | 21,448,284 |
| Extraordinary Desegregation Aid (est.) | $46.3m court + $3.2 f/inc | 49,500,000 | **0** | 0 | -49,500,000 |
| New Transportation - no penalty+cat (est.) | | 0 | **spec ed transpo + categorical up** | 3,000,000 | 3,000,000 |
| | | | | | |
| Total State Aid/Local Revenue Enhanced | | 167,476,160 | | 159,889,611 | -7,586,550 |

Assumptions:    1999-2000 GTB, 87.3% F/R Lunch, Proration of 1, and 1996-97 figures for enrollment, assessed valuation, income factor, transfers, fair share, text, and prop c.  Origin of differences is in bold in SB781 Formula column.

## APPENDIX B-2

### SB781 Funding Mechanism for Transfer Program for the Year 1999-2000

| Formula Element | SB781 Formula - SLPS | SB781 for SLPS + Transfers | SB781 SLPS | SB781 Total | Transfer $ |
|---|---|---|---|---|---|
| **Line 1:** | | | | | |
| Ln 1 (a+b): EP * Levy * GTB * Prorate | 40473 * 4.60 * 1225 * 1 | (40473+11562) * 4.60 * 1225.0 * 1 | 228,065,355 | 292,618,823 | 64,553,467 |
| Ln 1 Phantom Payments (incremental) | 0 | 0 | 0 | 0 | 0 |
| Total Line 1 | | | 228,065,355 | 292,618,823 | 64,553,467 |
| **Deductions:** | | | | | |
| Ln 2 (a): <AV/94/96 * Income F * Levy | 26964388.7 * .9358 * 4.60 | 26964388.7 * .9358 * 4.60 | 116,073,065 | 116,073,065 | 0 |
| Ln 2 (b): (96AV-94AV) * Income F * Levy | 82179 * .9358 * 4.60 | 82179 * .9358 * 4.60 | 353,754 | 353,754 | 0 |
| Ln 3 - Ln 9 (RR, Fed, Cig, Prop C, etc.) | | | 23,421,196 | 23,421,196 | 0 |
| Ln 10: Total Deductions (Sum 2-10) | | | 139,848,015 | 139,848,015 | 0 |
| | | | | | |
| Basic Formula Amount (Line 1 - Line 10): | | | 88,217,340 | 152,770,807 | 64,553,467 |
| Formula $ excluding phantom payments | | | | 0 | |
| Phantom Payments | | | 88,217,340 | 152,770,807 | 64,553,467 |
| Total Formula Amount | | | 88,217,340 | 152,770,807 | 64,553,467 |
| | | | | | |
| Ln 14: Free/Red Count * .2 * GTB * 2.75 | 35371 * .2 * 1225.0 * 2.75 | 35371 * .2 * 1225.0 * 2.75 | 23,831,211 | 29,673,971 | 5,842,760 |
| Ln 14(b): F/R Ct * .3 * GTB * (Levy - 2.75) | 35371 * .3 * 1191.63 * (4.60-2.75) | 35371 * .3 * 1191.63 * (4.60-2.75) | 23,392,775 | 29,128,043 | 5,735,268 |
| Total State Formula (Ln 1 - Ln 10 + Ln 14) | | | 135,441,327 | 211,572,822 | 76,131,495 |
| | | | | | |
| **Local Revenue Enhancement:** | | | | | |
| Property Tax or Sales Tax Increase (est.) | assessed val*collect rate * 4.6 | assessed val*collect rate * 4.6 | 21,448,284 | 21,448,284 | 0 |
| Extraordinary Desegregation Aid (est.) | 0 | 0 | 0 | 0 | 0 |
| New Transportation - no penalty+cat (est.) | spec ed transpo + categorical up | spec ed transpo + categorical up | 3,000,000 | 3,000,000 | 0 |
| | | | | | |
| Total State Aid/Local Revenue Enhanced | | | 159,889,611 | 236,021,106 | 76,131,495 |

Assumptions:  Same as in SLPS Spreadsheet, plus 75% F/R Lunch for transfers. Some of revenue would be paid as fair share, free text, and prop c (would be additional revenue source that would be offset by deductions in Lines 7-9).

**APPENDIX C**

 

## AGREEMENT AMONG PARTICIPATING SCHOOL DISTRICTS

This Agreement is made and entered into by Participating School Districts consisting of the School District of the City of St. Louis (City District), regular school districts in St. Louis County currently participating in the voluntary pupil transfer program in the St. Louis School Desegregation Case (County Districts), and the Special School District of St. Louis County (SSD).

RECITALS:

A.     This Agreement, authorized as a part of the court-approved 1999 Settlement Agreement in the Desegregation Case, enables eligible pupils currently participating in the transfer program, from both the City and the County, to continue in their host (receiving) school districts and also enables participation by new eligible pupils in the future, subject to the terms and conditions stated below.

B.     This Agreement likewise enables current sending and receiving districts, as a matter of complete lawful local autonomy free of any further court supervision in the Desegregation Case, to continue serving the educational needs of those children subject to the terms and conditions stated below.

C.     The County Districts express a good faith belief, based on current intentions and circumstances and in reliance upon continuation of adequate funding by the State and assuming maintenance of the current level of interest by eligible pupils residing in the City, that new eligible pupils from the City will continue to be accepted by the County Districts for at least six years, with anticipated total participation of seven to nine thousand City pupils in the sixth year, or 70% of current levels (as adjusted in the last sentence of paragraph 5, below) plus or minus ten percentage points.  The Participating Districts likewise express a good faith belief that the County-to-City transfers will continue at a substantial level.

54



D.     Notwithstanding the foregoing anticipated participation in the transfer program it is recognized as reasonable that the City District prepare now for a minimum of a four thousand student enrollment increase in its schools caused by a reduction in number of transfer students.

E.     According eligible City pupils enrolled in the County Districts now and for the next three years the opportunity to complete high school will be the highest priority, subject to "zoning" and funding requirements set forth below.  Students  currently enrolled in high school shall have the opportunity to complete their education at the high school at which they are currently enrolled.  Eligible City pupils enrolled in the County Districts at any time will have the opportunity to continue in the program through high school graduation, subject to "zoning" and financial requirements as set forth below.

F.     It is the further expectation of the Participating Districts that the pupil transfers contemplated by this Agreement will be fully funded by the State in accordance with the provisions of SB 781 (and enactments made therein) and the 1999 Settlement Agreement in the Desegregation Case, without the need for any expenditure of or subsidization from local school district revenues.

G.     This Agreement Among Participating School Districts does not pertain to vocational education, except for certain provisions set forth below regarding transportation and SB 781 funding for vocational education transfer students. Vocational education is covered by the vocational education portions of the 1999 Settlement Agreement.

NOW, THEREFORE, in consideration of the premises, the terms and conditions of this Agreement, and the provisions of the 1999 Settlement Agreement and proposed Final Judgment submitted to the Court for approval in the Desegregation Case, the Participating School Districts agree as follows:

1.      This Agreement shall be effective only when and if all the following events occur:  (1) the City voters approve a tax increase compliant with the provisions of SB 781 (and the enactments made therein) before March 15, 1999; (2) a "final judgment" is entered and the Missouri Attorney General provides proper notice thereof prior to March 15, 1999 in compliance with the provisions of SB 781 (and the enactments made therein); (3) the 1999 Settlement Agreement and this Agreement are expressly approved by the Court as requested by the parties in the Desegregation Case; and (4) the funding contemplated by SB 781 (and the enactments made therein) goes into effect.

2.      On or before July 1, 1999 the Participating Districts shall, pursuant to the "subject to" provision in the last sentence of R.S.Mo. §162.1060.2(1), establish a New Entity (whether a new not-for-profit corporation, unincorporated association or other) which shall receive, hold and disburse all funds pertaining to transfer students (including for transportation) generated under SB 781 (and enactments made therein) and all funds relating to the transfer program received pursuant to the 1999 Settlement Agreement or otherwise.  The New Entity shall operate the transfer program provided for herein and do all things incident thereto.  Governance, representation and "weighted" voting for the New Entity shall be as described for the statutory corporation in the last two sentences of R.S.Mo. §162.1060.1, albeit the statutory corporation will not be used by the Participating Districts.  All Participating Districts shall be members of or otherwise participate in the New Entity, but in no event will the weighted voting count any student more than once.  As an interim measure, the Participating Districts may designate one or more of the County Districts (or other designee) to serve as fiscal agent(s) or otherwise to act on behalf of the Participating Districts prior to formation of the New Entity.  All decisions hereunder by the Participating Districts prior to formation of the New Entity, including regarding formation of the New Entity, shall be made by "weighted" majority vote.  Pursuant to the "subject to" provision in the last sentence of

56

 

R.S.Mo. §162.1060.2(1), the Participating Districts opt out of, and elect to "supersede,"

all of the provisions pertaining to the statutory corporation and participating school

districts in R.S.Mo. §162.1060 except the financial provisions.

3.      Meetings of the New Entity's governing body will be "open" and duly

noticed in compliance with Missouri's Open Meeting Act.  The Caldwell NAACP

plaintiffs, Liddell plaintiffs and other attendees will be afforded reasonable opportunity to

be heard at open meetings.

4.      As under the 1983 Settlement Agreement, the City-to-County transfer

program provided for herein shall be for black students residing in the City, and the

County-to-City transfer program herein shall be for white students residing in predomi-

nately white school districts in the County.  To be "eligible" for transfer, pupils must

meet the 1983 Settlement Agreement's eligibility requirements as such requirements

may hereafter be clarified or modified by unanimous consent of the affected sending

and receiving districts acting through the New Entity.

5.      Each County District agrees to maintain, within 15%, the lesser of (a) its

current number of eligible City pupils or (b) the number of City transfer students the

district would currently need to attain, but not exceed, the 25% Plan Goal (as defined in

the 1983 Settlement Agreement), and to continue giving priority to siblings, for the next

three school years, but only on the conditions that (1) enough eligible pupils apply, (2)

such busing "zoning" requirements as may be imposed by the New Entity are met, (3)

the County District continues to receive its full per-pupil cost reimbursement as defined

in paragraph 19 below, (4) space is available in the district, (5) the sending district

meets its obligations to provide student information promptly and accurately as required

below (with a 25-calendar-day notice and cure period and in any event in compliance

with Missouri's Safe Schools Act), and (6) no court order is entered barring or affecting

compliance with or altering the terms of this Agreement or of the County Districts'

separate contemporaneous agreement with plaintiffs, in whole or material part; pro-

57

 

vided, however, that any County District whose current resident black enrollment exceeds 10% and whose current per-pupil cost exceeds the County average by 50% or more need not hereafter accept new transfers.  No County District shall be deemed to have violated the foregoing commitment if the County Districts' total enrollment of transfer students during the year in question is within 15% of the current (1998-9) total, after such current total has been adjusted downward for lack of full-day kindergarten, for City pupils in excess of Plan Goal, and for a County District opting out pursuant to the foregoing proviso.

6.      Subject to the proviso in the foregoing paragraph, each County District agrees to give two-year notice to cease accepting new City transfers, unless full per-pupil cost reimbursement fails for the district, space is lacking in the district, or the district has exceeded the Plan Goal, in which event only one-year notice is required.  Any such notice shall be in writing, shall be given to each then Participating District and to the New Entity, and shall be sent by first class mail (or any quicker means) at least two years or one year (depending on which notice period applies) prior to July 1 of the school year for which new transfers will cease.  Thus, a County District's commitment for new transfers would be three years per the preceding paragraph, and if it desired to cease accepting new transfers starting with the 2002-3 school year  (assuming none of the conditions were triggered before then), the district must give two-year notice on or before June 30, 2000.

7.      Except as limited by the preceding two paragraphs, each County District shall have the right to determine its own level of acceptance of new transfer students (if any) each year.  County Districts desiring to continue at their current (or a modified) level thus may do so.  Likewise, County Districts desiring to phase out their involvement at some point may also do so and, by carefully tailoring their acceptance of new transfer students, should be able to devise their own phase-out plan which is gradual, controlled and predictable.



8.    There shall be a ten-year maximum on the acceptance of new transfers from either the City or the County, which maximum may be extended or modified by the New Entity as permitted by law.

9.    Eligible City pupils accepted at any time may continue in their host district in the County through high school graduation on condition that (1) "zoning" requirements are met and (2) full cost reimbursement continues without any local district expenditures of any kind for any costs at all including for transportation. The second of these conditions shall be deemed to have failed if in any given year the New Entity lacks sufficient funds to satisfy all of the first four priorities listed in paragraph 20. A student who ceases to meet "zoning" requirements for his host district may apply to attend another County District that serves his new "zone." The County Districts for his new "zone" will give priority to admitting such a student . In general, eligible City pupils accepted at any time who later fail to meet "zoning" requirements may continue in the program through high school graduation subject to the same conditions in the first sentence of this paragraph (except that, as to the second condition, the first five priorities must be satisfied).

10.    Notwithstanding any other provisions to the contrary herein, if any host district is required to expend local revenue to subsidize its participation in the transfer program (including costs of transportation) said district may immediately, not later than August 20 in any school year, elect to cease participating in the transfer program and return all transfer students to the sending district(s) at the conclusion of the school year in which the election is made. Written notice of such election shall be mailed by first class mail (or any quicker means) to each then Participating District and to the New Entity no later than August 20 as aforesaid. Expenditure of local revenue and sub-sidization within the meaning of the first sentence of this paragraph shall be deemed to have occurred if the New Entity lacks sufficient funds to reimburse the host district for its full per-pupil amount as set forth in the fourth category of priorities in paragraph 20.

11.     Students failing to meet "zoning" requirements may, subject to the other conditions in paragraph 5, continue in their host County Districts if they can provide their own transportation or if other means of transporting the student are available to the New Entity at no additional cost, subject to the host district's right to regulate and control the time, place and manner of student arrivals and departures.  Excepting kindergarten, and whenever feasible and assuming it can be done without further cost, "zones" will be modified to provide full grade level transfer opportunities for grades 1 through 12 in each zone.

12.     According eligible City pupils enrolled in the transfer program now and for the next three years the opportunity to complete high school will be the highest priority, subject to "zoning" and funding requirements.  Students currently enrolled in high school shall have the opportunity to complete their education at the high school at which they are currently enrolled. Eligible City pupils enrolled in the program at any time will have the opportunity to continue in the program through high school graduation, subject to "zoning" and funding requirements.  The Participating Districts, through the New Entity, shall, as a first priority, develop strategies and procedures to implement the foregoing.

13.     County Districts continuing to accept new eligible City pupils after year three will continue to give priority to siblings.

14.     Each County District will establish a "Parents' Council" for parents and guardians of City pupils attending the County District.  The County District's superintendent will meet with the Parents' Council at least twice a year.

15.     The New Entity will establish internal procedures to receive and respond to complaints of transfer students and their parents, who may be represented by counsel for the Caldwell NAACP plaintiffs, counsel for the Liddell plaintiffs or any other representative of their choice.



16.    In an effort to reduce significantly the costs of transportation, to provide additional educational benefits and to increase parental involvement, the Participating Districts presently plan to phase in a new program which will pair neighborhood zones in the City with no more than four clusters of receiving districts in the County. The Participating Districts anticipate that new transfer students may need to be "zoned" starting next year (1999-2000), but that existing transfer students will not be required to be "zoned" for at least three years. To foster a smooth transition and minimize disruption, the Participating Districts also anticipate using during 1999-2000 much of the administrative and transportation "infrastructure" that is already in place for the existing transfer program.

16.5   The New Entity, for at least six years and subject to the other terms and conditions of this Agreement, shall provide transportation for vocational education transfer students, as it does for general academic transfer students. To the extent possible, the zones for vocational high schools located in the County shall conform to the zones for general academic schools in the County, but no student shall be denied access to a program on the basis of zoning. Any continuation of transportation for vocational education students by the New Entity after the sixth year shall be subject to the New Entity's further consent and agreement.

17.    Sending districts agree to promptly, fully and accurately provide discipline and other information to receiving districts for transfer applicants, including at least a full year's complete disciplinary records, all information regarding special-education services and needs, and any other information the New Entity may hereafter determine to require. The New Entity may also specify the timing and manner of providing such information. Sending districts agree to cooperate with and not interfere with receiving districts in their solicitation, acceptance and maintenance of eligible students. It is understood that receiving districts may need to seek new transfers at particular grade levels to assure smooth transitions but they will otherwise avoid targeting of specific

segments or categories of eligible pupils consistent with prior custom and practice permissible under the 1983 Settlement Agreement.

18.    County Districts each, at their own individual election, have the option to participate in the County-to-City transfer of white students.  In the event a County District elects out of the County-City transfer program, one year's notice shall be provided, and all students currently enrolled in the County-City transfer program shall be able to complete their current level (i.e., grade school, middle school or high school) in the City magnet schools.  In no event shall the City District receive more than 5% of the enrollment of a County District that has at least a 25% minority enrollment, in the County-City transfer program, absent consent of the County District.

19.  Subject to the priorities in the next paragraph, each County District will receive from the New Entity its per-pupil cost reimbursement as defined in the 1983 Settlement Agreement (but based on membership).  The "mid-point" method, whereby above-average-cost County Districts agree to accept the mid-point amount between their actual per-pupil cost and the County Districts' average per-pupil cost, shall apply in the event of a shortfall.

20.    The New Entity shall disburse funds in the following order of priority, with each successive category to be funded in full before any funds are allocated to the next category: (1) full reimbursement to SSD for special education services for current and new transfer students, (2) the New Entity's operational expenses, which will be kept to a minimum, (3) transportation costs, (4) per-pupil cost reimbursement to receiving districts which, for County Districts, shall be as defined in the preceding paragraph and which, for the City District, shall be the statutory amount (excluding any amount for transportation) received by the New Entity for each County resident attending a City magnet school (the so-called "passthrough" principle; if this does not constitute the cost per pupil for the City District, the District may invoke the appropriate terms of this Agreement), (5)



establishment of appropriate reserves for the foregoing, (6) counseling and (7) supple-mentary programs.

The New Entity shall place in a separate vocational education account any per-pupil funds, less amounts for transportation, received by the New Entity from the State for vocational education transfer students and shall then pay those funds (not including for transportation) to the vocational education transfer student's sending district (which will be either the City District or SSD); provided that, for years four, five and six, if the cost to transport vocational education transfer students exceeds the transportation amount received by the New Entity from the State for such students, then the New Entity shall pass that cost difference to the sending district as a deduction from the payment to that district.

20.5   Funds generated by Gifted, Medicaid, Exceptional Pupil Aid and other sources identified by the New Entity shall, with respect to transfer students, be paid to the receiving districts providing the services for students qualifying under such programs and shall not be paid to the New Entity.  Such funds shall be deducted from reimbursable costs of education for purposes of computing per-pupil cost reimbursement under paragraph 19 above.  The New  Entity shall have all rights under R.S.Mo. 167.126 to collect and recover for a public placement student any excess amount the New Entity pays to a receiving district for such a student over and above the revenue otherwise received by the New Entity on account of the student.

21.    The New Entity will ensure that, prior to January 1, 2000, the two non-hold-harmless host County Districts are reimbursed their first-year losses under SB 781 in a total amount not to exceed $800,000.

22.    Regarding special education services:

Students with disabilities may continue to participate in the voluntary pupil transfer program.  Their selection shall be consistent with the procedures used to select all other students.  The receiving school district shall provide

63




students with disabilities who are selected to participate with a free appropriate public education (including receiving special education and related services consistent with their IEP).

For new transfer students (entering the transfer program after the 1998-99 school year) receiving special education services in the receiving district, the sending district will reimburse the receiving district (City District for County students) or the New Entity (for City students) for the amount, if any, that the full cost of providing both general education and special education services (less any federal and state-aid special education amount received by the provider of special education services other than SB 781 funds) exceeds the amount of SB 781 (excluding for transportation) funds that come to the City District/New Entity by reason of that student's participation in the transfer program, the amount of which reimbursement shall in no event exceed the cost of such special education services.

For example, if SB 781 funds (excluding for transportation) for a particular student total $7,000, and the actual per-pupil cost (see paragraph 20(4)) of the general education of the student in the district in which the student is attending is $5,000, and the actual cost of the special education services provided to the student (net of regular categorical reimbursements) is $2,500, then the amount of reimbursement by the sending district would be $500 ($5,000 plus $2,500 less $7,000). Likewise, if the cost of general education is $9,000 and the cost of special education is $2,500, the reimbursement would be $2,500, or if the cost of general education is $4,000 and the cost of special education is $2,000, no reimbursement would be due. Finally, if there are no general education services, then the reimbursement shall be the amount by which the cost of special education services exceeds $7,000, if any (e.g. Phase III students).

 

If the sending district determines that the special needs of its student are accommodated in educational programs within the sending district, then the student may be educated within the sending district at the option of the sending district.

Acceptance of new transfer students already receiving special education services in their district of residence shall be limited to space and program availability in the schools assigned to the transportation zone in which such student resides.  Receiving districts will reasonably endeavor to accommodate such students subject to such limitations.

The New Entity shall establish guidelines regarding transfer students receiving special education services in order to conform such transfers as needed to the transportation, "zoning" and space and program availability provisions of this Agreement.

22.5   With respect to the lump sum payment of $9,046,059 received by the New Entity on behalf of SSD for payments arising from Court Order L(43)98, the New Entity shall disburse said funds to SSD as follows:

> (a)   $2,748,174 plus an amount not to exceed $3,549,711 based on actual reimbursable expenses for fiscal year 1998-99 on July 1, 1999;
>
> (b)   $2,748,174 on July 1, 2000;
>
> (c)   Amounts due for FY 99 shall be paid no earlier than July 1, 1999.

23.   Any and all disputes and claims of breach arising under or with respect to this Agreement shall be resolved by nonbinding mediation followed by, if mediation fails, final and binding arbitration with any remedy strictly limited to specific performance during one school year, and with an agreed 100-day period of limitation, starting on the date of the alleged breach, for the assertion of any claim or dispute.  Absent specification of other procedures by the New Entity, acting pursuant to unanimous consent of the affected Participating Districts, or by the parties to a dispute or claim,



any such mediation or arbitration shall be conducted by or under the auspices of, and in accordance with the rules and procedures of, the American Arbitration Association, at its St. Louis office. With respect to students, the New Entity will establish procedures which, among other things, will assure full access to the process.

24.     This Agreement is not assignable. Third-party beneficiary status is disclaimed as to any entities or persons other than the Participating School Districts; provided, however, that individual eligible transfer students and applicants who agree to submit to binding arbitration and to remedial limitations as more fully set forth in the preceding paragraph may assert rights under this Agreement and, in such proceedings, may be represented by counsel for the Caldwell NAACP plaintiffs, counsel for Liddell plaintiffs or any other representative of their choice.

25.     This Agreement shall be binding upon each Participating School District's successors, assigns, replacements or substitutes of any kind or nature whatsoever, including without limitation any "overlay" or "transitional" district or governing body or any other kind of district or governing body which assumes all or any part of a Participating School District's authority or responsibility, as may now or hereafter exist.

26.     The Recitals at the beginning of this Agreement are not contractual or binding in any respect. Nor shall they be deemed to alter, amend, supersede, add to or detract from any of the provisions of this Agreement in any respect.

27.     The New Entity and the Participating Districts shall have plenary authority, to the full extent permitted by law and this Agreement, to take any and all actions that may be necessary or expedient to carry out the letter or spirit of this Agreement, including without limitation the following:  the adoption, amendment and/or implementation of articles of incorporation (or association), bylaws, policies, procedures, plans, strategies, rules, regulations, standards, criteria and guidelines; negotiation of, letting of bids for, execution of, performance of and enforcement of



contracts; owning, selling, buying, leasing and otherwise transacting in real or personal property; holding and investing funds as permitted by law; engaging the services of consultants and professionals; and hiring employees.

28.     This Agreement may be amended by the unanimous written consent of all Participating School Districts affected by the amendment.

29.     Receiving districts recognize and understand that it is important for them to keep sending districts well apprised of their plans and intentions as to the future of the transfer program and, to this end, to aid sending districts in planning for any reduction in the scope of the transfer plan through the provision of data and other information reasonably requested by sending districts.  While this Agreement sets forth technical notice requirements, receiving districts recognize a responsibility to provide such information and assistance with reasonable promptness to ensure the best interests of children are protected.

30.     Unless and until other or further requirements regarding recipients of notice are adopted by the New Entity, any notices required to be sent to a Participating District under this Agreement shall be sent to the district's then serving superintendent and board president with a copy to the last known counsel of record for the district.


**THIS AGREEMENT CONTAINS AN ARBITRATION
PROVISION WHICH MAY BE ENFORCED BY THE PARTIES**




Affton School District

By: _Gay M. Jompkin_
    Superintendent




Bayless School District

By: _James W. Sucharski_
      Superintendent

67-B

 

Brentwood School District


By _Kettle Rehenburg_
President, Board of Education

 

SCHOOL DISTRICT OF CLAYTON

By _____

President, Board of Education




FERGUSON REORGANIZED SCHOOL DISTRICT, R-II

By: _____

Dr. Stan Scheer, Superintendent

 

**APPENDIX C**

HANCOCK PLACE SCHOOL DISTRICT

BY: _____
Arthur J. Schomaker, President

_____
Al Bourisaw, Superintendent

HAZELWOOD SCHOOL DISTRICT

By _____
Vice President



Jennings School District

By: _____
    Superintendent

67-H

KIRKWOOD SCHOOL DISTRICT R-7

By: _____Rick Stream_____
Board President

SCHOOL DISTRICT OF THE CITY OF LADUE

by: _Susan M. Nietz_____

President of the Board of Education

67-J




LINDBERGH SCHOOL DISTRICT
By:

Frank Gregory, President
Board of Education
Lindbergh School District

Dated:  February 18, 1999

67-K

 

## APPROVED AND ACCEPTED:

MAPLEWOOD RICHMOND HEIGHTS SCHOOL DISTRICT

By: _Arthur W. Rusler_ _____

     **Superintendent**         **(Title)**



MEHLVILLE SCHOOL DISTRICT

By _Candy Green President_
(title)

Parkway School District

By _____
President, Board of Education

67-N

Pattonville School District

By _Robert W. Dillon, Sr._

Robert W. Dillon, Sr., Board President

RITENOUR SCHOOL DISTRICT

By _Paul W. Doerrer, Superintendent_
                    (title)

School District of Riverview Gardens

By: _Rudy L. Smith_
    Board President

Rockwood School District

By *Deborah A. Fluchel*
President, Board of Education

SPECIAL SCHOOL DISTRICT OF ST. LOUIS
COUNTY

By: _____
               President of the Board

University City School District
St. Louis County, Missouri

By: _____

Attorney for
University City School District


Appendix C




WEBSTER GROVES SCHOOL DISTRICT

By: _Ellen Chapman_
　　Ellen Chapman, President of the
　　Board of Education


Copeland, Thompson & Farris, P.C.

By _Douglas A. Copeland_
　　Douglas A. Copeland
Attorneys for Webster Groves School District


VALLEY PARK SCHOOL DISTRICT
Copeland, Thompson & Farris, P.C.

By _Douglas A. Copeland_
　　Douglas A. Copeland
Attorneys for Valley Park School District

Lashly & Baer, P.C.

By: _____

     Kenneth C. Brostron
     Dirk DeYong
Attorneys for the Board of Education of the
City of St. Louis

**APPENDIX D**

 

## AGREEMENT BETWEEN COUNTY DISTRICTS
### AND CALDWELL NAACP, LIDDELL PLAINTIFFS
### AND UNITED STATES

This Agreement is made and entered into by regular school districts in St. Louis County currently educating transfer students from St. Louis City in the St. Louis School Desegregation Case (County Districts), the Caldwell NAACP plaintiffs, the Liddell plaintiffs and the United States. In consideration of the premises, the provisions of this Agreement, and the provisions of the 1999 Settlement Agreement and proposed Final Judgment submitted to the Court for approval in the Desegregation Case, the parties agree as follows:

1.      This Agreement shall be effective only when and if all the following events occur: (1) the St. Louis City voters approve a tax increase compliant with the provisions of Missouri Senate Bill 781 (and the enactments made therein) before March 15, 1999; (2) a "final judgment" is entered and the Missouri Attorney General provides proper notice thereof prior to March 15, 1999 in compliance with the provisions of SB 781 (and the enactments made therein); (3) the 1999 Settlement Agreement and this Agreement are expressly approved by the Court as requested by the parties in the Desegregation Case; and (4) the funding contemplated by SB 781 (and the enactments made therein) goes into effect.

2.      Each County District agrees for the next three school years to maintain, within 15%, the lesser of (a) its current number of City transfer students or (b) the number of City transfer students the district would currently need to attain, but not exceed, the 25% Plan Goal (as defined in the 1983 Settlement Agreement in the Desegregation Case), and to give priority to siblings, but only on the conditions that (1) enough eligible pupils (as defined in the separate Agreement Among Participating School Districts executed contemporaneously herewith ["Districts' Agreement"]) apply, (2) such busing "zoning" requirements as may be imposed by the New Entity, as

69

described in the Districts' Agreement, are met, (3) the County District continues to receive its full per-pupil cost reimbursement as defined in paragraph 19 of the Districts' Agreement, (4) space is available in the district, (5) the sending district meets its obligations under the Districts' Agreement to provide student information promptly and accurately (with a 25-calendar-day notice and cure period and in any event in compliance with Missouri's Safe Schools Act), and (6) no court order is entered barring or affecting compliance with or altering the terms of this Agreement or the Districts' Agreement in whole or material part; provided, however, that any County District whose current resident black enrollment exceeds 10% and whose current per-pupil cost exceeds the County average by 50% or more need not hereafter accept new transfers. No County District shall be deemed to have violated the foregoing commitment if the County Districts' total enrollment of transfer students during the year in question is within 15% of the current (1998-9) total, after such current total has been adjusted downward for lack of full-day kindergarten, for City pupils in excess of Plan Goal, and for a County District opting out pursuant to the foregoing proviso.

      3.    Any and all disputes and claims of breach arising under or with respect to this Agreement shall be resolved by nonbinding mediation followed by, if mediation fails, final and binding arbitration with any remedy strictly limited to specific performance during one school year, and with an agreed 100-day period of limitation for the assertion of any claim or dispute. Absent specification of other procedures by consent of the parties to a dispute or claim, any such mediation or arbitration shall be conducted by or under the auspices of, and in accordance with the rules and procedures of, the American Arbitration Association (AAA), at its St. Louis office, with both sides to bear equally the costs thereof. Also, absent further agreement otherwise, the arbitration shall be conducted by a three-arbitrator panel, comprised of two party-appointed arbitrators and a third (neutral) arbitrator selected by the two party-appointed arbitrators. If the party-appointed arbitrators are unable to agree upon a neutral,



selection of the neutral shall take place in accord with AAA rules and procedures. The parties shall bear the fees and expenses of their own respective arbitrators and shall split equally the fees and expenses of the neutral. It is further agreed that ordinary judicial proceedings to enforce or set aside any arbitration award shall, consistent with law, be brought in the United States District Court for the Eastern District of Missouri.

4.    The County Districts agree to provide prompt notice to the Caldwell NAACP plaintiffs, Liddell plaintiffs and United States of any challenges filed in any court to the program contemplated under this Agreement.

5.    This Agreement shall lapse and be of no further force or effect after the conclusion of the 2001-2002 school year.

**THIS AGREEMENT CONTAINS AN
ARBITRATION PROVISION WHICH
MAY BE ENFORCED BY THE PARTIES**

Affton School District

By: _____
   Superintendent

Bayless School District

By: _James W. Fushaishi_____
     Superintendent

71-B

Brentwood School District

By _Keith Palenberg_
President, Board of Education

71-C

SCHOOL DISTRICT OF CLAYTON

By _____

President, Board of Education

**APPENDIX D**

HANCOCK PLACE SCHOOL DISTRICT

BY: _____
Arthur J. Schomaker, President

_____
Al Bourisaw, Superintendent

71-E

HAZELWOOD SCHOOL DISTRICT

By _____

Vice President

71-F

KIRKWOOD SCHOOL DISTRICT R-7

By: *Rick Stream*

Board President

71-G

SCHOOL DISTRICT OF THE CITY OF LADUE

by: _Susan M. Nuetzel_

President of the Board of Education

71-H

LINDBERGH SCHOOL DISTRICT
By:

Frank Gregory, President
Board of Education
Lindbergh School District

Dated:  February 18, 1999

71-I

MEHLVILLE SCHOOL DISTRICT

By *Candy Green* President
        (title)

71-J

Parkway School District

By _____

President, Board of  Education

71-K

**Pattonville School District**

By _____

Robert W. Dillon, Sr., Board President

RITENOUR SCHOOL DISTRICT

By _Paul W. Doerrer_ Superintendent
(title)

71-M

Rockwood School District

By _Deborah A. Fluchel_
President, Board of Education

71-N




WEBSTER GROVES SCHOOL DISTRICT

By: *Ellen Chapman*

Ellen Chapman, President of the
Board of Education

Copeland, Thompson & Farris, P.C.

By: *Douglas A. Copeland*

Douglas A. Copeland
Attorneys for Webster Groves School District

VALLEY PARK SCHOOL DISTRICT
Copeland, Thompson & Farris, P.C.

By: *Douglas A. Copeland*

Douglas A. Copeland
Attorneys for Valley Park School District

71-O



**APPENDIX E**

72

 

# AGREEMENT BETWEEN CALDWELL-NAACP
## AND LIDDELL PLAINTIFFS AND THE
### BOARD OF EDUCATION OF THE CITY OF ST. LOUIS

THIS AGREEMENT is made and entered into the 5th day of January, 1998 by and between the Liddell Plaintiffs, the Caldwell Plaintiffs (hereafter "Plaintiffs") and the Board of Education of the City of St. Louis. (hereafter the "Board" or "Board of Education").

WHEREAS, the Liddell Plaintiffs, the Caldwell Plaintiffs and the Board of Education of the City of St. Louis ("the Parties") desire to achieve equality of educational opportunity through quality, integrated education and to end the need for court supervision in the matter of Liddell, et al. v. Board of Education of the City of St. Louis, et al., No. 72-100-C(6), as soon as possible; and

WHEREAS, there is agreement among the Parties that implementation of the procedures and practices outlined herein will facilitate these goals; and

WHEREAS, the Board of Education of the City of St. Louis is desirous of continuing to move forward with the implementation of its Desegregation Report and Policy Statement of August, 1995; and

WHEREAS, the Board of Education of the City of St. Louis is committed to providing the best possible education to its students under the laws and constitutions of the United States and of the State of Missouri; and

WHEREAS, the Parties to this agreement agree that strong new educational initiatives are needed to improve student performance, to ensure that schools are held accountable for such improvements, and to meet other desegregation goals;

NOW, THEREFORE, the Parties agree as follows:

1.    Intensive School Improvement

A.    The Board of Education will identify ten schools, based on low performance on standardized tests.  Elementary schools will be identified largely on the basis of reading scores.  Middle schools will be identified based on test scores and attendance.  High schools will be identified based on a combination of test scores, attendance, and graduation and dropout rates.

B.    These ten schools will be notified of their selection by the end of Spring, 1998.

 

C.     Intensive Remediation, 1998-99:

    (i)     Plan.  Each of the ten schools will be required to develop a comprehensive school-improvement plan that will address how the school will improve its achievement levels, and in the case of high schools, other outcomes.  The plan will be developed with parental input and will address staffing, resource allocation (including Title 1), curriculum, academic standards, professional development, and parental involvement strategies.

    (ii)    Professional Development and Curriculum Improvement.  Each of the ten schools will be required to choose and to implement an intensive, research-based professional development program from a list agreed to by the Parties, including but not limited to: Success for All, Comer School Development program, Accelerated Schools, and New American Schools models.

    (iii)   Technical Assistance, Staffing and Resources.  The Board of Education will make available highly qualified consultants and others to provide technical assistance to each school on an ongoing basis, will seek to assign highly qualified staff to each school, and will devote resources (including Title I funds) to implement effectively the school improvement plans and necessary professional development and curricular reforms.

    (iv)    The Board of Education may elect to immediately reconstitute any targeted school as set forth in No. 2 below if it determines that the targeted school's improvement plan is inadequate or, that intensive remediation is insufficient to reasonably expect improvement in one year.

2.     Reconstitution

    A.     Before the beginning of the 1999-2000 school year, the Board of Education will select three of the targeted ten schools for reconstitution and before the beginning of the 2000-2001 school year the Board of Education will select two additional targeted schools for reconstitution. The schools selected shall be those deemed to have made the least improvement, or least likely to make sufficient improvement in the very near future, as measured by student outcomes.  Four of these five schools shall be elementary schools.

2




B.   Reconstitution, in the discretion of the Superintendent, may include any or all of the following: reassignment of the principal or other administrative staff; reassignment of any or all of the teaching or other certified staff; implementation of hiring/rehiring procedures comparable to magnet schools or reconstitution methods carried out in schools in other districts.

3.   Teacher Training and Recruitment

The Plaintiffs and the Board of Education will develop and announce a joint effort, in conjunction with area teaching colleges and university schools of education, (and possibly the business community) to recruit and retain highly educated and talented young people to teach in the St. Louis Public Schools.

4.   Teacher Accountability

Plaintiffs will support the Board in any measures the Board determines are necessary to implement the reconstitution and accountability objectives of this Agreement including measures related to the transfer, retraining, discipline or termination of ineffective teachers and measures to provide incentives to effective teachers to participate in the schools identified through this Agreement.

5.   Principal Tenure

Plaintiffs and the Board will jointly seek to eliminate principal tenure in the St. Louis Public Schools.

6.   Early Childhood

The Parties recognize the success of the Board's early childhood programs. At the same time, the Board and other agencies have documented that many at-risk three and four-year olds are not presently served in a high quality preschool program, such as those offered by the Board, or by Head Start. The Parties will work to ensure that additional seats are made available to ensure that the benefits of a high quality early childhood education program are extended to the children most in need.

7.    Other Terms

    A.    This Agreement is an Interim Agreement to be in effect through the end of the 2000/01 school year.

    B.    This Agreement is intended by the Parties to substitute effective desegregation educational initiatives for those programs being implemented under the current Court orders  that have not proved effective, as more fully specified in Section 7(E), infra.  The Parties also intend that this Interim Agreement will be incorporated into a Final Agreement of the Parties in this case to replace the Court orders currently in effect.

    C.    This Agreement shall be effective immediately on its execution by the Parties but its full and continued implementation shall be conditioned upon approval by the Court of the proposals by the Parties to defund programs identified pursuant to Section (E) infra as ineffective, and the Court's approval to redirect those funds saved (including both State and Board desegregation funds) for the implementation of this Agreement in accordance with Section 7(E).  The obligations of the Parties may be terminated by any of the Parties if there are any future orders of the Court which are inconsistent with this Agreement.

    D.    The Board will allocate funds to support the activities provided for in sections 1(C) and 2 at each of the affected schools with the exact amount of such funding remaining within the sole discretion of the Board of Education of the City of St. Louis.

    E.    The intent of the Parties is to fund this Agreement through savings achieved by the discontinuation of quality education programs being implemented under the current Court orders that have proved ineffective in improving student performance.  The Board shall not be required to allocate all funds saved by defunding of these programs to the activities described herein, nor shall the Board be required to allocate funds to these activities in an amount exceeding the amount saved.  To the extent that Court action is needed to terminate funding of ineffective programs in order to make funds available under this Agreement, Plaintiffs will support such action, provided, however, that the Parties agree not to eliminate or substantially curtail any of the following programs during the period of this Agreement: early childhood (including pre-school and all-day kindergarten), summer school, libraries and media centers and college prep.  The Board will administer this Agreement in a manner consistent with its continuing commitment to integration and desegregation of the St. Louis Public Schools.

4

 

## 8.    Reporting and Evaluation

The Board shall evaluate academic progress at the ten low-performing schools, the effectiveness of the intensive remediation, the effectiveness of the reconstitution and other accountability measures in the agreement in improving student performance and the efficacy of the expenditures made under this agreement in bringing about the desired results.  Notwithstanding any other agreements or court order that may be entered subsequent to this agreement, the Board agrees to provide Plaintiffs with all information and data necessary to evaluate compliance with the terms of this Agreement.


William Douthit
Attorney for Liddell Plaintiffs


William L. Taylor
Attorney for Caldwell/NAACP Plaintiffs


Kenneth C. Brostron
Attorney for Board of Education of the
City of St. Louis