**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| LIDDELL, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 4:72-CV-100 HEA |
| | ) |
| BOARD OF EDUCATION OF THE | ) |
| CITY OF ST. LOUIS, MISSOURI, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**MEMORANDUM IN SUPPORT OF LIDDELL PLAINTIFFS'
MOTION TO ENFORCE SETTLEMENT AGREEMENT**

**I.  SUMMARY JUSTIFICATION FOR MOTION TO ENFORCE**

This decades old desegregation case was ultimately settled pursuant to a Desegregation Settlement Agreement ("DSA") – a settlement designed to help redress decades and decades of State mandated segregation in the St. Louis Public Schools District (the "District") and mitigate the harm suffered by generations and generations of African-American public school children. The DSA was incorporated into this Court's March 12, 1999 Order (the "Settlement Order") following a class action fairness hearing.  An essential component of the DSA and Settlement Order was funding for intradistrict desegregation and remediation programs agreed upon by the parties – funding that was years in the making. That funding was not only crucial to mitigating some of the harm occasioned by the State's constitutional violations and bringing some semblance of closure to this longstanding litigation but was also an essential part of the Liddell Plaintiffs' bargained for, going forward intradistrict desegregation and remediation programs. Indeed, as noted by the Court in its Settlement Order, the Plaintiffs would not have agreed to the settlement absent funding for the intradistrict desegregation and remediation programs.

The DSA obligated the District, for the benefit of the Liddell Plaintiffs and the Caldwell/NAACP Plaintiffs, to continue established intradistrict desegregation and remediation programs ("intradistrict remedies") and provided two funding sources:  1) State desegregation funding under public school funding legislation (Senate Bill 781 [hereinafter referred to as "SB 781"]); and 2) local sales tax revenue (a 2/3 of 1-cent sales tax approved by City voters on February 2, 1999 [the "Desegregation Tax"]).  The parties agreed that the Desegregation Tax would fund intradistrict remedies to be operated solely by the District.  The DSA also incorporated SB 781 which permitted the District to receive all the Desegregation Tax revenue for intradistrict remedies.

As clearly provided in the Settlement Order, the intradistrict remedies funding was for the exclusive benefit of District schoolchildren: "The legislative branch of the State of Missouri has enacted a law that **will provide long-term funding of on-going programs to implement school desegregation**.  The voters of the City of St. Louis have approved by almost a two to one margin a **sales tax increase to supplement the funding provided by the Missouri legislature**." *See* Settlement Order, at pp. 14-15, attached to Motion to Enforce filed contemporaneous herewith (hereinafter the "Motion") at Exhibit G. (Emphasis added). This Court accepted the State's contrite apologies and promises of "doing the right thing" going forward and approved the DSA via final judgment.  However, to make sure the State honored its promises and contractual obligations, the Court retained jurisdiction to enforce those promises.

Consistent with the Settlement Order, various provisions of the DSA made clear that: 1) the Desegregation Tax revenue would belong to the District for intradistrict remedies "unconditionally" (Ex. E, DSA, at §§18(a) and 18(b)); 2) the State would be contractually "obligated" to maintain SB 781 funding for the District that included the Desegregation Tax (*id*.,

2

at §§ 22.A.1. and 22.A.2.); and 3) "the State [would] not seek in **any proceeding** to limit or diminish the financial relief provided for under the agreement." (*Id*., at § 22.B) (Emphasis added). Thus, both the Settlement Order and the DSA made clear that the State was precluded from taking any actions (legislative, court-based, or otherwise) that deprived the Liddell Plaintiffs (along with the Caldwell/NAACP Plaintiffs) of the full benefit of the Desegregation Tax for intradistrict remedies.

From 1999 through 2006, the State fulfilled its funding promises by allocating 100 percent of the Desegregation Tax proceeds to the District for intradistrict remedies – in full recognition of the State's obligation to grant the District unencumbered use of the Desegregation Tax. However, in 2006, the State enacted Senate Bill 287 ("SB 287") which allowed for, among other things, the diversion of "local tax revenue" from the District on a per-pupil basis to fund charter schools. The language of SB 287 itself caused no concern regarding the Desegregation Tax until the State (through the Department of Elementary and Secondary Education ("DESE")) began interpreting the language of SB 287 to include the Desegregation Tax. Based upon that unilateral interpretation, the State started diverting from the District a per-pupil share of the Desegregation Tax revenue for St. Louis City schoolchildren attending charter schools. Since 2006, and over the objections of the Liddell Plaintiffs, the State has diverted more than $67 million that otherwise was guaranteed to the intradistrict remedies the Liddell Plaintiffs negotiated for in the DSA. *See* Exhibit M to Motion. That amount does not include the last two school years (2018-19 and 2019-20), which is understood to total in excess of $70 million.

As established and supported below, the Liddell Plaintiffs request an order compelling the State's full compliance with the DSA and the Court's Settlement Order, requiring specific performance of the DSA, finding the State in contempt, directing repayment of all monies

improperly reallocated (so that those funds can be used for desegregation and remediation in the District where the unconstitutional segregation took place), and awarding prejudgment interest and attorneys' fees.

## II.  DISCUSSION

**A.     This Court Has Recognized that it has Jurisdiction to Enforce the Settlement Order, Find the State in Breach of the DSA, and Hold the State in Contempt.**

Without question, this Court has jurisdiction to enforce the Settlement Order, to order specific performance of the DSA, and to hold the State in contempt.  Federal courts have squarely held that they have authority to interpret and enforce settlement agreements incorporated into previous court orders.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380 (1994); *Miener v. Missouri Dept. of Mental Health*, 62 F.3d 1126, 1127 (8th Cir. 1995); *Harbor Venture, Inc. v. Nichols*, 934 F. Supp. 322, 323 (E.D. Mo. 1996).  As this Court ruled in its March 26, 2019 Order (Doc. No. 466, p. 5), "[a] federal district court 'has inherent power to enforce a settlement agreement as a matter of law when the terms are unambiguous.'"  The Court also has jurisdiction to hold the State in contempt for violating the Settlement Order. *See* 18 U.S.C. § 401; *Chao v. McDowell*, 198 F.Supp.2d 1093, 1098 (E.D.Mo. 2002).

Here, the DSA was incorporated into the Settlement Order and, as established below, is unambiguous as it relates to the intent and purpose of the Desegregation Tax.  *See* Exhibit G to Motion, at p. 19.  Also, as this Court has also ruled in its March 26, 2019 Order (Doc. No. 466), "[i]n the event of a dispute between the State of Missouri and Plaintiffs, motions for specific performance may be filed in this Court."  *Id*. p. 5; Exhibit E to Motion, DSA § 22.B.3, p. 41.[1]

---

[1] In fact, in full recognition of this Court's continuing jurisdiction, the parties have returned to the Court on various occasions seeking approval of proposed changes to the DSA. *See, e.g.,* Dkt. No. 372 ("The Court retains jurisdiction over the matter to enforce the provisions of the Agreement pursuant to [*Kokkonen*]").

Accordingly, this Court has the authority to grant specific performance and hold the State in contempt to force full compliance with the Court's Settlement Order incorporating the DSA.

**B.     The State is in Clear Violation of the Settlement Order and the DSA.**

The State's application of SB 287 (specifically Mo.Rev.Stat. Section 160.415) to reallocate the Desegregation Tax revenue violates the terms of the Settlement Order and the DSA – which provide that the Desegregation Tax would be paid to the District for intradistrict remedies – because the State is now diverting Desegregation Tax proceeds from the District. Since this was first brought to the State's attention in 2008, *see* Motion Exhibit J, the State has never denied its breach despite multiple opportunities, including before this Court, to do so.

1.     **The State Agreed in the DSA, and the Settlement Order Required, That All Desegregation Tax Revenue Would Be "Unconditionally Assigned" to the District for Desegregation Remediation Purposes To Benefit the Plaintiff Classes.**

A plain reading of the DSA and the Settlement Order reveals 1) that 100 percent of the Desegregation Tax revenue was to be received by the District to be used for intradistrict remedies, and 2) that the District's "unconditional" receipt of the Desegregation Tax was an essential term of the parties' settlement so that the District could continue post-settlement intradistrict remedies for the benefit of the Plaintiff classes.

The Eighth Circuit has held that an action to enforce a settlement agreement is in the nature of a breach of contract claim governed by state law. *See Myers v. Richland Cnty.*, 429 F.3d 740 (8th Cir. 2005) (Court analyzes claim for breach of settlement of federal gender discrimination claim under North Dakota law); *Gatz v. Sw. Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir. 1988); *Mico, Inc. v. Wagner Elec. Corp.*, 802 F.2d 322, 323 (8th Cir. 1986).

Under Missouri rules of contract construction, the interpretation of a settlement agreement is a question of law for the Court. *See Goldring v. Franklin Equity Leasing Co.*, 195

5

S.W.3d 453, 456 (Mo. Ct. App. E.D. 2006). "In Missouri, the general rules of contract construction apply when interpreting settlement agreements." *Pierson v. Kirkpatrick*, 357 S.W.3d 293, 299 (Mo. Ct. .App. S.D. 2012) (internal citation omitted). Where the parties have expressed their agreement in plain and unambiguous writing, the Court must determine the intent of the parties solely from the "four corners" of the contract. *Walley v. La Plata Volunteer Fire Dept.*, 368 S.W.3d 224, 232 (Mo. Ct. App. W.D. 2012).

Moreover, Missouri case law establishes that a court is required to ascertain the parties' intent based on the law that existed at the time the contract was entered into, and should not consider subsequent changes or modifications of the law in deciding what the parties intended. *See Sharp v. Interstate Motor Freight System*, 442 S.W.2d 939, 945 (Mo. 1969)("It is a fundamental rule that the laws which exist at the time and place of making a contract, and at the place where it is to be performed, affecting its validity, construction, enforcement, termination and discharge, enter into and form a part of the contract as if they were expressly referred to or incorporated therein"); *Carroll v. Oak Hall Associates, L.P.*, 898 S.W.2d 603, 607 (Mo. Ct. App. W.D. 1995) ("Parties are deemed to enter into their contracts in contemplation of the law as it exists at the time, and it is sometimes said that the existing law is a part of the contract as if it were written therein.").

> Section 11.1 of the DSA provides that:
>
> The parties agree that an express condition to the City Board's decision to accept this Agreement is that **the sales tax** and the resulting State aid will **produce a minimum of $60 million in additional funding for the St. Louis City Public Schools** based on current SLPS enrollments and current levels of participation in the interdistrict transfer program.

Exhibit E to Motion, at § 11.1 (emphasis added).  Section 18(a)4 provides: "The **revenues from any and all taxes imposed through a ballot measure** submitted by the Transitional District, and any resulting State and federal aid, (excluding any attributable to transfer students) **shall be**

6

**unconditionally assigned to the City Board** upon receipt by the Transitional District." *Id*., at § 18(a)4 (emphasis added).

Similarly, Section 18(b) of the DSA provides that:

> Upon such a determination [that Transitional District in no longer needed], the Transitional District is dissolved and **any and all taxes and other receipts approved for the Transitional District are assigned to the City Board**.

*Id*., at § 18(b) (emphasis added).

In the Settlement Order, this Court recognized the District's right to receive the entire Desegregation Tax for intradistrict remedies benefitting the Plaintiff classes:

> In May 1998, the **Missouri General Assembly passed Senate Bill 781, which provides**, inter alia, **for approximately $40m per year in state funds for St. Louis city schools** on the condition that (1) on or before March 15, 1999, the state attorney general notify the revisor of statutes that a "final judgment" had been entered in this case as to the State and its officials, and (2) **the voters of the City of St. Louis pass a sales or property tax which would generate approximately $20m per year for the public schools**.

Exhibit G to Motion, Settlement Order, at pp. 2-3 (emphasis added). This interpretation of the DSA was reiterated by the Court when it stated: "It is **understood by the parties** that **City Board will receive** a minimum of $60m a year from State aid under Senate Bill 781 and **the new sales tax**." *Id*., at p. 4 (emphasis added). The Court went further and stated: "The Transitional School District created by SB 781 will be dissolved by the State Board of Education, **with revenues from the new sales tax assigned to City Board**." *Id*. (emphasis added).

Later in the Order, the Court stated how this settlement funding was an essential part of the remedy for this egregious constitutional violation, directly tied to ongoing desegregation remedies, and how this fact was understood and agreed to by the parties:

> The overwhelming consensus was that while the settlement did not provide a perfect remedy, it is fair, reasonable and adequate **because it guarantees long-term funding for continuing the key aspects of the 1983 plan, including**

7

**remedial programs in the city schools, the magnet schools, the voluntary transfer programs and an area-wide vocational education plan**.[2]

*Id*., at p. 6.  The Court also stated the following:

> The Court concludes that the settlement is adequately funded as to ensure that **City Board's obligations** under the agreement can be fulfilled.  Funding is grounded in SB 781, which provides that funding will be **derived from the local sales tax approved by the voters** and the amendments in SB 781 to the State's statutory scheme of school funding.  The sales tax was properly authenticated by the General Assembly and properly placed on the ballot.  No procedural challenges to the election have been timely filed.  **The State agrees to provide the funds as set forth in SB 781** and **all signatories have agreed to the financial terms**.  Furthermore, **the revenue generated by the sales tax shall be paid directly to or assigned by the Transitional District to the City Board**.
>
> In sum, the relief offered under the settlement is substantial and adequate **to assure the opportunity for a quality education for children of the plaintiff classes**.  **This factor weighs heavily in favor of approval of the agreement**.

*Id*., at pp. 11-12 (emphasis added).

In further recognition of the unfettered requirement that the District receive the Desegregation Tax for the operation of intradistrict remedies benefitting the Plaintiff classes, the Court entered the following directives:

> **IT IS FURTHER ORDERED** that City Board and the Director of Revenue of the State of Missouri **shall follow** the procedures and instructions set forth in other statutes which govern local sales taxes in collecting the proceeds of the new sales tax effective July 1, 1999.  **These funds shall be forwarded to the Treasurer of the Board of Education of the City of St. Louis**, no later than the tenth of each month, and City Board shall assume the responsibilities of the taxing entity as described in Mo. Rev. Stat. Section 32.087.1.
>
> **IT IS FURTHER ORDERED** that **the revenues from any tax imposed through a ballot measure** by the Transitional School District, and any resulting State and federal aid (excluding any attributable to transfer students), **shall be unconditionally assigned to City Board** if received by the Transitional School District.

---

[2] This conclusion by the Court tracks the DSA which provided that:  "This Agreement is intended to provide a complete substitute for and modification of all substantive remedial obligations placed upon the City Board by the above-referenced orders, **subject to financing pursuant to Missouri Senate Bill 781**."  Exhibit E to Motion, p. 2. (Emphasis added).

*Id*., at p. 19-20 (emphasis added).

The State's course of conduct immediately following the execution of the DSA and entry of the Settlement Order – allowing the District to receive all of the Desegregation Tax proceeds from 1999 through 2006 without any of those funds being used to decrease District formula funding – provides additional support for the Liddell Plaintiffs' position that the Desegregation Tax proceeds have always been for the District's use in implementing the intradistrict remedies. *See Rhoden Investment Co. v. Sears, Roebuck and Co.*, 499 S.W.2d 375, 383 (Mo. 1973) ("It is well established that the interpretation placed on the contract by the parties prior to the time it became a matter of controversy is entitled to great, if not controlling, influence in ascertaining the intent and understanding of the parties and the courts will generally follow such practical interpretation."); *Stone v. Farm Bureau Town & Country Ins. Co. of Missouri*, 203 S.W.3d 736, 745 (Mo. Ct. App. S.D. 2006).

This unconditional right to have the Desegregation Tax paid to the District for intradistrict remedies is consistent with the law established by SB 781, which Missouri law treats as being incorporated into the DSA and which was in fact incorporated into the DSA. *Sharp*, 442 S.W.2d at 945. Under SB 781, the District had the right to receive 100 percent of the Desegregation Tax revenue for intradistrict remedies benefiting the Plaintiff classes. Because SB 781 was expressly and by operation of law incorporated into the DSA, the State is contractually obligated to allow the District to receive that revenue unencumbered.

Thus, the Settlement Order, the DSA, course of conduct and the provisions of SB 781 all establish the unconditional, contractual right of the Liddell Plaintiffs to demand that the State abide by its obligations to make sure the District receives 100 percent of the Desegregation Tax proceeds to implement intradistrict remedies within that school system.

There is no dispute that these provisions were not followed when the State began interpreting SB 287 to justify diverting Desegregation Tax revenue. Before the Court is uncontroverted evidence of the improper diversion of funds in violation of the DSA and the Settlement Order. *See* Exhibits H, J and M to Motion. Tellingly, the State never responded to the District's notice of this breach when it was sent in 2008, and only cryptically responded to the demand to cease made by the District and the Plaintiff classes in January, 2016 (Exhibits K and L). When the issue was brought to this Court's attention in 2016 through a prior Motion to Enforce (ECF No. 381), the State elected not to respond substantively – to avoid inevitably admitting that the Desegregation Tax monies were indeed being diverted from the District despite contrary promises to the Liddell Plaintiffs. For these reasons, the Court should summarily enforce the DSA. *See Gatz*, 836 F.2d at 1095 ("A district court has the inherent power to summarily enforce a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous."); March 26, 2019 Order (Doc. No. 466) ("[a] federal district court 'has inherent power to enforce a settlement agreement as a matter of law when the terms are unambiguous.'").[3]

In another desegregation case, the State unsuccessfully tried a similar tactic to escape its funding commitments. In *Jenkins v. Kansas City Missouri School District*, 516 F. 3d 1074 (8th Cir. 2008), the Court held that the State could not make statutory modifications to the school funding formula that diverted dedicated local tax levies in violation of the terms of a court-approved desegregation settlement. *See Jenkins*, 516 F.3d at 1085-86. Here, the State is again trying to change the rules years after the desegregation settlement by reducing school district

---

[3] To the extent that the Court determines that additional evidence is necessary to determine the intent of this express language of the DSA, or the State's breach, the Liddell Plaintiffs request that they be allowed to present such evidence by way of an evidentiary hearing. *Fiegener v. Freeman–Oak Hill Health Sys.*, 996 S.W.2d 767, 772 (Mo. Ct. App. S.D. 1999).

funding based on receipt of Desegregation Tax revenue. Like the courts in *Jenkins*, and as recognized by this Court, the Liddell Plaintiffs are entitled to specific performance to permit the District's receipt of all Desegregation Tax revenue to operate intradistrict remedies. The State's obligations and breach are both clear and should be summarily recognized as such by the Court.

      **2.    The State Expressly Agreed That It Was Obligated to Facilitate Settlement Funding that Included the Desegregation Tax and Agreed It Would Not Limit or Diminish Desegregation Remediation Funding.**

The State's actions in reallocating Desegregation Tax revenue in reliance on Missouri Revised Statutes Section 160.415.4 (created by SB 287) also violates Section 22 of the DSA. The "State's obligation" under the DSA included "funding to SLPS under SB 781" and "the payment of obligations incurred pursuant to the provisions of this Agreement." Exhibit E to Motion, DSA §§ 22.A.1. and 22.A.2. Those DSA and SB 781 funding and payment obligations for intradistrict remedies include facilitating the District's full receipt of the Desegregation Tax. *Id*., at §§ 22.A.1. and 22.A.2.

Under Section 22.B., the State agreed that it would "not seek in **any proceeding** to **limit or diminish the financial relief** provided for under the agreement." *See id*., at § 22.B.4. Here, the State is utilizing Missouri Revised Statutes Section 160.415.4 (enacted via legislative proceedings) in a manner that clearly "limits" or "diminishes" the Desegregation Tax revenue expressly provided for in the DSA. *See* Exhibit G to Motion, Settlement Order, at pp. 11-12 ("funding will be derived from the local sales tax approved by the voters and the amendments in SB 781 to the State's statutory scheme of school funding"). Various Missouri courts have precluded the State and State agencies from violating such broad settlement language.

For example, in *Tap Pharm. Prods., Inc. v. State Bd. of Pharmacy*, the Missouri Supreme Court rejected an attempt by the State Board of Pharmacy to place a pharmacy permit on three-years' probation in the face of a settlement agreement wherein the State promised that it would

11

"refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusions" from the Missouri Medicaid program. 238 S.W.3d 140, 142 (Mo. 2007) (en banc).

In *Angoff v. Mersman*, the court precluded the State from instituting actions against a holding company and holding company investors based on settlement release language that covered "any claim, demand, action or suit of whatever kind or nature." 917 S.W.2d 207, 209 (Mo. Ct. App. W.D. 1996). In rejecting the State's argument to limit the broad settlement language, the court held: "The covenant was not ambiguous. 'Any' and 'whatever kind' are all inclusive; nothing is excluded. Nothing is unclear about this. No one should have difficulty understanding what is included and what is excluded. ... Any reservation or limitation as to the scope of a settlement agreement must be clearly expressed." *Id.* at 210-11; s*ee also Holmes v. Multimedia KSDK, Inc.*, 395 S.W.3d 557, 560 (Mo. Ct. App. E.D. 2013) ("We have routinely held that the word 'any' when used with a class in a release is all-inclusive, it excludes nothing, and it is not ambiguous.").

By enacting legislation that is being interpreted in a way to reallocate the Desegregation Tax revenue, the State's actions certainly "limit" and/or "diminish" the financial relief originally agreed to under the DSA and expressly provided to the District via SB 781. Those actions also constitute a clear breach of the State's "obligations." Court enforcement of the Settlement Order and the DSA, plus contempt remedies, are necessary to compel the State's full compliance.

C.  **Monetary Relief is Appropriate and Necessary to Ensure Specific Performance by the State under the DSA, to Enforce the Court's Order, and as a Sanction for Contempt.**

In light of the State's unequivocal violation the Settlement Order and breach of various provisions of the DSA, the Liddell Plaintiffs are entitled to specific performance under the express terms of the DSA. *See* Exhibit E to Motion, DSA, at § 22B.1. As noted in *Owen v. Hankins*, "[n]o specific process exists in Missouri for enforcing a settlement agreement. One

12

possible method of enforcement is to raise the issue in a motion to enforce the settlement agreement. Such a motion adds a collateral action seeking specific performance of the agreement." 289 S.W.3d 299, 304 (Mo. Ct. App. S.D. 2009) (internal citations omitted). *Owen* went on to state that "a motion to enforce a settlement agreement is 'in reality, a suit for specific performance. Specific performance is purely an equitable remedy.'" *Id.* (quoting *DeWitt v. Lutes*, 581 S.W.2d 941, 945 (Mo. Ct. App. S.D. 1979)).

As a general principle, "specific performance" includes monetary relief or pecuniary compensation:

> (1) An order of specific performance or an injunction will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires. It need not be absolute in form and the performance that it requires need not be identical with that due under the contract.
>
> \*\*\*\*
>
> (3) In addition to specific performance or an injunction, damages and other relief may be awarded in the same proceeding and an indemnity against future harm may be required.

*Restatement (Second) of Contracts*, § 358 (1981).

The Missouri courts have concluded that within the context of ordering a specific performance remedy, a court may also award pecuniary compensation as needed to assure full enforcement of the contract. As noted by the Missouri Supreme Court in *Arnold v. Smith*, "a court of equity which decrees specific performance may also award damages resulting from delay in performance." 436 S.W.2d 719, 724 (Mo. 1969). Additionally, the Court held that "[e]quity may, when its jurisdiction is invoked to obtain the specific enforcement of a contract \* \* \* award damages or pecuniary compensation to the plaintiff along with specific performance when the decree as awarded does not give complete and full relief." *Id*. (internal quotations omitted); s*ee also McDermott v. Burpo*, 663 S.W.2d 256, 263 (Mo. Ct. App. W.D. 1983) ("As

13

incident to its decree, the trial court has the discretion to relate performance to the original date of the agreement through an additional award of any costs caused by the delay.  This award does not arise as legal damages from the breach of the contract; rather, it is more in the nature of an equitable accounting between the parties in affirmance of the contract"); *Magruder v. Pauley*, 411 S.W.3d 323, 333 (Mo. Ct. App. W.D. 2013).

In addition, such monetary relief is appropriate because the State's "obligations" under the DSA expressly include 1) "funding to SLPS under SB 781" and 2) "the payment of obligations incurred pursuant to the provisions of this Agreement."  Exhibit E to Motion, DSA, at §§ 22.A.1. and 22.A.2.

Moreover, because the State is in contempt of the Settlement Order, the Court may order the State to pay the District all amounts improperly reallocated, as well as order future compliance.  *See Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000) ("Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both"); *Enterprise Financial Group. v. Podhorn*, No. 4:16CV1619 HEA, 2018 WL 6524008, at *2 (E.D.Mo., Dec. 12, 2018) ("Courts may use this contempt power to compel a defendant to comply with a court order, to compensate the complainant for losses sustained, or to do both."); *Chao*, 198 F.Supp.2d at 1098 ("Civil contempt is remedial in nature and designed both to coerce obedience and to compensate the complainant for losses sustained.") (internal quotations omitted).

Here, the State improperly and illegally reallocated Desegregation Tax monies by treating them as "local revenue" for the benefit of charter schools instead of for the benefit of the Liddell Plaintiffs through District operated desegregation and remediation programs where the segregation took place.  St. Louis City residents voted that such funds would be used for those

District operated intradistrict desegregation and remediation programs. Over the last thirteen years, the State has inappropriately withheld more than $67 million in intradistrict desegregation and remediation programs funding from the District and its students (that include the Liddell Plaintiffs). *See* Exhibit M to Motion, Declaration of Angela Banks, at ¶¶ 14-15. Moving forward, the Liddell Plaintiffs are entitled to specific performance of the DSA, enforcement of the Settlement Order, and a finding of contempt to preclude the State from reallocating Desegregation Tax proceeds to any party other than the District. Additionally, all monies improperly withheld by the State should be reimbursed so that those funds can be utilized for intradistrict desegregation and remediation programs purposes in accordance with the DSA and the Settlement Order.

### III.  CONCLUSION

The State is in contemptuous violation of the Settlement Order and in breach of the DSA. The Desegregation Tax was intended to provide long-term funds for the District to use to help ameliorate the lasting and difficult vestiges of segregation for the exclusive benefit of the Plaintiff classes. The State's reallocation of those proceeds to non-parties who have no intradistrict desegregation and remediation obligations is a clear violation. The State should not be permitted to engage in such a blatant violation of the DSA, Senate Bill 781 and this Court's Settlement Order and avoid its legal and contractual obligations at the direct expense of the Plaintiff classes. The Court should enforce the settlement by directing that that Desegregation Tax be used solely for District operated intradistrict desegregation and remediation programs, that the State be deemed in contempt, and that monies improperly diverted be repaid. It should also award prejudgment interest and attorneys' fees.

15

Dated:  October 15, 2019	Respectfully submitted,

By: */s/ William A. Douthit*
   William A. Douthit
   William A. Douthit – Attorney at Law, L.L.C.
   P.O. Box 6961
   St. Louis, MO 63006-6961
   Telephone: 314-434-7759
   Facsimile:  314-434-7759
   wadouthit@aol.com

Attorneys *for Liddell Plaintiffs*

16