# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| CRATON LIDDELL, et al., | ) |
| Plaintiffs, | ) |
| v. | ) No. 4:72CV100HEA |
| BOARD OF EDUCATION OF THE CITY OF ST. LOUIS, MISSOURI, et al., | ) |
| Defendants. | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion to Motion to Enforce Settlement. The parties have submitted memoranda in support of their respective positions. Additionally, the parties have provided supplemental briefs in response to the Court's Order of October 27, 2020. For the reasons set forth below, the Motion is granted in part and denied in part.

### Facts and Background

The Eighth Circuit Court of Appeal has set forth a succinct factual background of this decade old case:

> In 1972, Minnie Liddell, on behalf of African American school children in St. Louis and their parents, filed suit against the St. Louis Board of Education (the City Board). Liddell alleged that the City Board and its administrators had perpetuated racial segregation and discrimination in St. Louis public schools in violation of her children's

constitutional rights. *See Liddell v. Bd. of Educ.*, 469 F.Supp. 1304 (E.D. Mo. 1979).

In 1973, the district court certified the Liddell plaintiff class. In 1976, another group of students and parents, together with the NAACP, intervened in the litigation. We refer to them as the Caldwell-NAACP plaintiffs. *See Liddell v. Caldwell*, 546 F.2d 768, 769 (8th Cir. 1976). In 1977, the State of Missouri, the Missouri State Board of Education, and the State Commissioner of Education were made defendants. *Liddell*, 469 F.Supp. at 1312.

In 1983, the parties agreed on a comprehensive desegregation plan that provided for a voluntary suburban transfer program, magnet schools, new education programs, capital improvements, and improved vocational education in the school district. *Liddell v. Bd. of Educ.*, 567 F.Supp. 1037 (E.D. Mo. 1983). The State and the City Board funded this plan.

In 1996, the State moved for a declaration that the City Board no longer operated a segregated school system and for relief from its funding obligations under the desegregation plan. After three years of negotiations, the parties reached, and the court approved, the 1999 Desegregation Settlement Agreement (the Agreement).

Under the Agreement, the parties agreed that the City Board would continue various remediation programs. In exchange, the St. Louis Public School District (the District) would receive a minimum of $60 million in funding per year, consisting of a combination of state aid and local tax revenue. Senate Bill 781, passed in 1998, set forth a revised funding formula for calculating state aid to the District. The remainder of the Agreement's funding came from a "desegregation sales tax" that St. Louis voters approved on February 2, 1999.

Senate Bill 781, in addition to providing state funding under the Settlement Agreement, created St. Louis charter schools and provided for their funding. The 1998 law required the District to pay charter schools a per pupil portion of its state aid for each resident student

[2]

> who chose to attend a charter school rather than a District school. From 1999 until 2006, however, the District did not include any revenue raised from the desegregation sales tax in the funds that the District transferred to the charter schools.
>
> In 2006, the General Assembly passed Senate Bill 287, which revised the state aid funding formula for public schools. *See generally* Mo. Rev. Stat. § 163.031 (2006). Senate Bill 287 allowed charter schools to be formed as "local educational agencies," meaning that St. Louis charter schools would receive aid directly from the State instead of the District. Under the 2006 law, when a charter school declares itself a local educational agency, the State must "reduce the payment made to the school district by the amount specified in this subsection and pay directly to the charter school the annual amount reduced from the school district's payment." *Id.* § 160.415.4. While Senate Bill 781 in 1998 had not required the District to pay any portion of its local tax revenue to the charter schools, Senate Bill 287 in 2006 mandated that charter students receive a per pupil percentage of local tax revenues received by the District. *Id.* § 160.415.2(1), 160.415.4.

*Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 963–64 (8th Cir. 2018).

## Discussion

The parties are once again before the Court for a determination of whether the State has violated the Desegregation Agreement by the mandate that charter students receive a per pupil percentage of the local sales tax.

A district court possesses the inherent power to enforce a settlement agreement where the terms are unambiguous. *Barry v. Barry,* 172 F.3d 1011, 1013 (8th Cir.1999)). It is well established that settlement agreements are governed by principles of contract law. *MLF Realty L.P. v. Rochester Ass'n,* 92 F.3d 752, 756

[3]

(8th Cir. 1996). "The essential elements of a valid settlement agreement are the involvement of parties who are competent to contract, a proper subject matter, legal consideration, mutuality of obligation, and mutuality of agreement." *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006) (citing *L.B. v. State Comm. of Psychologists,* 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)). "Courts are bound to enforce a contract as written if the terms of the contract are clear, plain and unequivocal." *Kells v. Missouri Mountain Properties, Inc.*, 247 S.W.3d 79, 85 (Mo. Ct. App. 2008) (citing *Malan Realty Investors, Inc. v. Harris,* 953 S.W.2d 624, 626–27 (Mo. banc 1997)). "The creation of a valid settlement agreement requires a meeting of the minds and a mutual assent to the essential terms of the agreement." *St. Louis Union Station Holdings, Inc. v. Discovery Channel Store, Inc.*, 301 S.W.3d 549, 552 (Mo. Ct. App. 2009).

There is no, nor can there be, any dispute that the Charter Schools were not an entity party to the Settlement Agreement. Charter Schools did exist at that time. Thus, it could not be contemplated by the parties that a separate group of City students would need to be factored into the Agreement; there were no separate "charter school" current resident City students at the time. The Charter Schools were created by Senate Bill 781, which also provided a portion of the funding under the Settlement Agreement.

[4]

Plaintiffs argue the per pupil percentage violates the Settlement Agreement. Plaintiffs contend the tax was an impetus for entering into the Settlement Agreement in order to implement the plan for desegregation. It is, under the Agreement, to be used solely for remediation of the segregation and discrimination which prompted the filing of this lawsuit; since the State does not require the funds to be used for remediation purposes, the allocation of the tax revenue to the Charter schools is a violation of the agreement.

The State argues it has not violated the Settlement Agreement.  It contends that, reading the Settlement Agreement as a whole, rather than taking provisions out of context, its actions in allocating the per pupil percentage to the Charter Schools is proper under Section 11, subtitled "Funding," of the Settlement Agreement.

The relevant portions of Section 11 provides:

11.1 FUNDING-The parties agree that an express condition to the City Board's decision to accept this Agreement is that the sales tax and the resulting State aid will produce a minimum of $60 million in additional funding for the St. Louis Public Schools based on current SLPS enrollments and current levels of participation in the interdistrict transfer program. Towards this end, the signatories agree that at no time will any proration factor affecting Line 14(a) or (b) be less than the highest proration factor applied to Lines 1(a) or (b) of the State Foundation.  The parties also agree that with a proration factor of 1.0, the Formula will generate funds as set forth in Appendix B, Columns 4, 5 and 6.  For the 1999-2000 school year, no revenue amounts received because of half-count transfer students during the 1998-1999 school year will be included in lines 7, 8 or 9 of the State Aid Formula.

11.2 The State contractually guarantees the City Board for current resident City students after deductions that full funding of SB 781 will in fact be provided in the future as follows: (1) the amount per pupil for 1999-2000 shall be $4,154 for a free and reduced lunch student and $2,838 for a non-free and reduced lunch student for Lines 1 and 14 of the Formula after deductions, and (2) for each year thereafter, the State contractually guarantees payment of Lines 1 and 14 of the Formula after deductions of the greater of the amount computed for the 1999-2000 or the amount calculated for the then current year.

Without limiting any current (or future new) source of funding to which Participating Districts or the New Entity are entitled based on services provided, staffing or any other criteria, the State contractually guarantees the City Board and the New Entity that full funding of SB 781 on a per pupil basis shall be provided, and further specifically agrees as follows:

   (1)   For 1999-2000, the State contractually guarantees to pay to the new entity (or its designee) for per-pupil State aid the greater of the total amount set forth below (which is based in part on DESE estimates and current year actuals as indicated) or the total amount hereafter calculated based on actual year-end figures for 1999-2000:…..Total $6,459.00

In addition, for each pupil qualifying for the free and reduced lunch program, line 14 funding is also contractually guarantee by the State in the following minimum amounts per pupil: …Total $1,335.94

   (2)   For each year thereafter (subject to the temporal limit set forth below in this paragraph 11), the State guarantees contractually payment of the greater of the per pupil amounts guaranteed for the 1999-2000 less $465 per pupil (which is a stipulated deduction solely for the purpose of establishing a floor) or the amounts calculated for the then current year.  Furthermore, the State guarantees contractually that in any future year (subject to the temporal limit set forth below in this paragraph 11), the Formula items in the foregoing calculations (line 1, 14a and line 14b) shall not be reduced below the amounts guaranteed for those items for 1999-2000 (less the aforesaid stipulated $465 per pupil).

Clearly, pursuant to the specific terms of the Settlement Agreement, the parties intended the funding to be based on a "per pupil" basis for City public school students.  It is indisputable that  charter school students are public school students.  The charter school students, therefore, should be entitled to the same per pupil funding formula as District school students. There is no violation of the Agreement with the State reducing the amount of the tax revenue to the District from District funds.

The violation, however, arises with the *use* by the Charter schools of the funds deducted from the amount the State gives to the District.  The Settlement Agreement sets out the reasons for its creation and the reasons, compelling as they were and are, the parties mutually agreed to forego further litigation in the class action suit challenging the segregation of St. Louis City schools.  They resolved this case by continuing the Court ordered remediation requirements and by agreeing to implement substantial measures to eliminate the discrimination and segregation in the school system. They agreed to fund these measures through the State aid *and* the local "desegregation" sales tax. It is curious and interesting the State argues thaprovisions of the Settlement Agreement, with regard to its per pupil argument, should not be taken out of context, while it chooses to ignore other equally significant terms of the Agreement. As a result of a legislative strike on the

legislative roulette wheel the Charter schools are not providing remedial constructs to racial segregation as contemplated and required by the settlement agreement.

The parties unambiguously set out their intent and the purpose of the Agreement, while recognizing that the City Board was required, by previous Court Orders, to implement remedial programs.

> The parties recognize that the substantive remedial obligations of the City Board are set forth in various court orders. These include, but are not limited to: the District Court's Order of July 5, 1983, *Liddell v. Board of Education,* 567 F. Supp. 1037 (E.D.Mo. 1983) (providing *inter alia,* for magnet schools, part-time educational programs, quality education initiatives, and other *Milliken 11* programs in the public schools of the City of St. Louis); the District Court's Order of May 21, 1980, *Liddell v. Board of Education,* 491 F.Supp. 351 (E.D. Mo. 1980) (providing for a comprehensive desegregation plan including, *inter alia,* student assignment, transportation, faculty and staff assignment, certain magnet schools, and educational improvements); and various other subsequent remedial orders directed to the City Board.
>
> The Plaintiffs, the United States and the City Board recognize the need for continuing remedial efforts to ensure that the enjoyment of full equality of opportunity by plaintiff school children is not impaired by the effects of past segregation.
>
> This Agreement is intended to provide a complete substitute for and modification of all substantive remedial obligations placed upon the City Board by the above- referenced orders, subject to financing pursuant to Missouri Senate Bill 781.
>
> This Agreement is intended to serve as a final judgment as to the State Defendants and the City Board in the <u>Liddell</u> litigation and to terminate the continuing jurisdiction and supervision of the Court over the State Defendants and City Board subject only to Section 22 of this Agreement.

> The parties have entered into this Agreement to dispense with the likelihood of further complex, lengthy and expensive litigation and to provide an appropriate education for St. Louis children.

Section 9 of the Settlement Agreement provides:

> The City Board, the SSD, the Metropolitan Cooperative and all parties recognize that desegregation serves important remedial and educational goals and helps children to prepare for participation in a pluralistic society. Therefore, the City Board, the SSD, the Metropolitan Cooperative and all parties will continue to pursue a policy of desegregation, which will include decisions and actions relating to the assignment of students to schools and classrooms, the construction, consolidation, closing or renovation of school facilities and the assignment of faculty and staff to schools.

As a substitution for the remedial Orders entered in this litigation, the City Board continues to be obligated to use the agreed funding to implement desegregation measures in the District schools. The same applies to the funds allocated to the Charter public schools. But for the agreement to fund the remediation programs, the Agreement would not have been consummated.

Plaintiffs urge the Court to order the State to repay the funds previously withheld from the District schools and given to the Charter schools. The District, however, did not object or otherwise challenge the violation until 2016, and the District has failed to adequately argue that it did not relinquish its right to challenge these payments. Moreover, there has been some suggestion that the District did not utilize all funds for remediation purposes. That portion of the Motion to Enforce Settlement will be denied, without prejudice upon the

[9]

justification for the delay and establishment that all funds collected through the local tax have been utilized by the District for remediation purposes.

## Conclusion

The purpose of the Settlement Agreement was to resolve the ongoing litigation over desegregation in the St. Louis public schools.  The parties, including the State of Missouri, agreed that the Settlement Agreement was a substitution for the remediation obligations of the City.  As such, the parties agreed that the funding of the Settlement would come from the State and a local sales tax.  These funds would be limited solely to remediation programs.  In light of the current state of affairs in our nation today, it is imperative of our collective conscience that all discriminatory, segregationist, and otherwise divisive activities be fully and absolutely denounced by all citizens who abide in this republic. Considering this, it is incumbent upon those entities charged with providing the education of the public school students to rise above and fulfill the duty to provide a nondiscriminatory and desegregated school system.  Equality and the path for opportunity extends not only outside the public school system in St. Louis, but within it as well. The local sales tax was intended to implement desegregation programs for all public school students, whether they attend District public schools or Charter public school.  Ergo, the tax funds must be utilized as such in Charter schools as well as District schools.

And, so it is.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Enforce Settlement, [Doc. No. 468], is granted in part and denied in part.

**IT IS FURTHER ORDERED** that from the date of this Opinion, Memorandum and Order, all local "desegregation" tax funds, whether paid to the District or allocated to the Charter schools through a deduction from the funds given to the District, and provided to the Charter schools, shall be used solely for desegregation programs.

**IT IS FURTHER ORDERED** that if no desegregation programs exist in the Charter schools, the funds shall be turned over to the District to continue to implement and fashion the programs contemplated by the Settlement Agreement.

Dated this 24th day of November, 2020.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE